33 C.C.P.A.(Patents)

### Application of SWAIN et al.

### Patent Appeal No. 5077.

Court of Customs and Patent Appeals.
March 4, 1946.

William P. Spielman and Edmund H. Parry, Jr., both of Washington, D. C., for appellants.

W. W. Cochran, of Washington, D. C., (R. F. Whitehead, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

By this appeal appellants seek review and reversal of the decision of the Board of Appeals of the United States Patent Office affirming the action of the Primary Examiner rejecting all the claims, numbered 1 to 7, inclusive, embraced in application, serial No. 371,562, for a patent on "Recovery of Guanidine Salts." No product claims are involved.

The brief for appellants states, inter alia:

"Various guanidine salts, of which the most important is guanidine nitrate, may be obtained as a solution in liquid ammonia

in the form of a hot autoclave charge under high pressure according to U. S. patent No. 2,221,478 issued to the present inventors jointly with Hill. Such process of producing guanidine salts in solution is explained in applicants' specification * * * and illustrated in the drawing * * *, but need not be referred to here since the present invention is concerned solely with the recovery of the salts in dry, finely divided form from ammonia solution.

\* \* \* \* \* \*

"The present process of recovering guanidine salts from ammonia solution involves flash evaporation as previously stated. This is carried out by spraying the liquid ammonia solution or suspension of guanidine salt into a closed chamber while supplying sufficient heat to vaporize the ammonia. The evaporation chamber is shown at 8 in the drawing * * *. The solution is delivered from the autoclave 4 through a steam jacketed pipe 15 and a reducing valve 23 to a spray delivery nozzle 7 in the chamber. The vaporized ammonia is removed from the top of the evaporation chamber through pipe 22. The dry finely divided guanidine salt falls to the inclined bottom of the chamber from which it is scraped into the trough 10 and removed by a screw conveyor 20."

It is also stated in appellants' brief that the nitrate salt of guanidine is used in large quantities in the production of explosives, nitro-guanidine, a flash-inhibitor (not involved here) being developed from it, and that "the salt must be in a very finely divided form free from combined ammonia * * *."

Appellants select claims Nos. 3 and 7 as being representative. They read:

"3. A method of recovering dry, finely divided solid guanidine nitrate from a solution thereof in liquid ammonia which comprises spraying said solution into a closed chamber while supplying sufficient heat to vaporize the ammonia."

"7. A method of recovering dry, finely divided guanidine nitrate from a hot autoclave charge comprising essentially a hot solution of guanidine nitrate in liquid ammonia which comprises spraying said hot solution into a closed chamber, whereby the sensible heat content of the charge is utilized in evaporating the ammonia and the guanidine nitrate is separated as a finely divided solid, collecting the guanidine nitrate on a heated surface in said chamber, and discharging the guanidine nitrate by a screw conveyer through a heated outlet pipe, whereby the heat and agitation aids in removing absorbed ammonia from the guanidine nitrate particles."

It is noted that those claims are specific to the recovery of nitrate salt of guanidine. The other claims relate to the recovery of guanidine salts generally, and claims 4, 6, and 7 specify what is stated in appellants' brief to be "the preferred method which includes the employment of a hot autoclave charge as the starting material."

The only reference cited is a patent No. 2,142,984, issued to Benjamin H. Thurman, January 3, 1939, for evaporating mechanism and process of which the examiner stated:

"This reference teaches a process for separating solids from a solution by spraying the solution while hot into a heated flash chamber. The solution is prepared in heated mixer 10 and thence is led through pipes 19, 22, 33 to nozzle 34, which sprays the solution into the flash chamber 35. The volatiles evaporate and are recovered in the condensing system 14. The solid material settles as a finally divided mass on the bottom of the flash chamber, and is removed by the scraper 79 and thrown into the jacketed outlet 62 in which a screw conveyer operates.

"It appears, therefore, that this patentee teaches a method comprising every step called for by these claims. This patentee does not limit his method to the separation of any specific solid from any definite volatile, but his method is applicable generally to the separation of any solid in solution from the volatile solvent.

"The solid could be, it is believed, guanidine nitrate and the solvent liquid ammonia, and the process would be still the same process. A new patent cannot properly be granted, it is believed, for every different material that can be treated by the Thurman process."

The view of the board was expressed in somewhat different phraseology but in thought it followed the view of the examiner, definitely recognizing that the reference "does not state that the method is applicable specifically to the recovery of dry guanidine salt from a solution thereof in liquid ammonia."

It does not seem to be questioned by appellants that the steps defined in the appealed claims correspond, in a general way, to the steps disclosed in the reference. In their brief it is said, "It may be readily conceded that from a manipulative stand-

120

point the Thurman process is parallel to the present process," but the brief continues:

"However, the materials treated, the materials recovered, and particularly the actions occurring during the flash evaporation treatment, are widely divergent. It is believed fair to say from a full reading of the patent that Thurman teaches nothing more than that flash evaporation may be employed to separate from vaporizable solutions materials which deteriorate at prolonged high temperatures such as would be employed in a boiling off process."

The gist of appellants' contention before us is that in the process of recovering guanidine salts some sort of chemical change occurs in the materials used, and that the reference does not teach any chemical change in such materials as are therein specifically mentioned but discloses only a "physical evaporation process," saying, at one place in their brief, "The very fact that the problem solved by the invention was essentially a chemical problem not involved in the physical evaporation process of the Thurman patent is an important factor."

At another place in their brief it is said:

"The problem solved by the present invention is essentially a chemical problem, namely the recovery of guanidine salts free of ammonia from the ammonia solution in which they are obtained. Both the Patent Office Examiner and Board of Appeals fell into the error of treating the invention merely as a physical process of driving off volatile matter from solids to which it was chemically inert. In order that the Court may fully understand the invention and the problem solved thereby a brief discussion of the chemistry involved will be given."

This is followed by an interesting dissertation relating to the chemical qualities of guanidine, guanidine salts, etc., in which are included some formulas.

Emphasis is also placed upon an affidavit by Mr. Paden, one of the joint applicants here, directed to the alleged chemical reaction.

■ We have very carefully considered the contention so made, but we are not convinced of error on the part of the tribunals of the Patent Office.

It seems clear to us that the Thurman process discloses, *as steps,* everything disclosed and claimed as steps in appellants' application and the *steps comprising the process* are the essential features for con-

sideration in determining the right of appellants to a patent—not the particular material to which the process is applied nor the particular substance obtained by its application.

In the brief of the Solicitor for the Patent Office before us attention is directed to the breadth of the Thurman patent, the following from the specification being quoted:

"It is therefore an object of the present invention to provide a process and apparatus by which volatile materials may be removed from solid or semi-solid materials and the temperatures throughout the process controlled to avoid injuring the material.

"Another object is to provide a process and apparatus by which any type of material containing volatiles and solids or semi-solids may be treated to remove the volatiles, and the temperature, time of treatment and evaporating conditions controlled in accordance with the materials being treated."

The brief then points out that while the patent gives examples of materials which may be treated by the process therein defined, it is "in no way limited to the treatment of these materials," and quotes claim 11 of the patent which reads:

"11. A high speed continuous process for separating vaporizable materials from unvaporizable materials which are damaged by prolonged treatment at elevated temperatures and which are solid or semi-solid at temperatures at which they are stable in contact with the atmosphere, which comprises the steps of: rapidly advancing under superatmospheric pressure a small stream including said materials through an elongated passageway of small cross section, heating said stream for a brief period during the rapid flow thereof and while the same is in such a state of agitation as to prevent local overheating and to an extent sufficient to cause substantially instantaneous separation of the vaporizable materials, as vapor, when said stream is introduced into a vapor separating zone, continuously introducing the stream into said vapor separating zone, continuously withdrawing the vaporizable materials therefrom in the form of vapor at a rate sufficient to maintain a vacuum in said zone, and continuously pushing the unvaporizable materials from said vapor separating zone substantially as soon as deposited therein and cooling the same to a temperature at

which they are stable in contact with the atmosphere while they are being pushed from said zone and are substantially free of vaporizable materials and before contact with the atmosphere."

It is obvious that appellants applied to the recovery of guanidine salts a process every step of which had been defined in the reference patent. If, as a result of the use of the Thurman process, some sort of chemical reaction took place in the case of guanidine salts, that was not a discovery, in any patentable sense, on the part of appellants. Such reaction must have been inherent in the process itself.

The authorities cited by appellants which are claimed to support their position have been carefully studied. We do not regard them as having any applicability under the facts of this case.

The decision of the board is affirmed.

Affirmed.