**Earl A. CHENAULT, Plaintiff,**

v.

**NEBRASKA FARM PRODUCTS, Inc., a Nebraska Corporation, and Ervin Burkholder, Defendants,**

**Arnold Dryer Company, a Wisconsin Corporation, Intervening Defendant.**

Civ. No. 303.

United States District Court
District of Nebraska,
North Platte Division.

Jan. 24, 1956.

See also, 107 F.Supp. 635.

Thomas E. Scofield and Carter H. Kokjer, Kansas City, Mo., A. W. Geissinger, Columbus, Ohio, and M. E. Crosby (Crosby & Crosby) North Platte, Neb., for plaintiff.

C. Earl Hovey and Donald E. Johnson, Kansas City, Mo., and Frank M. Johnson, Lexington, Neb., for original defendants.

· Arthur L. Morsell, Jr., (Morsell & Morsell) Milwaukee, Wis., and Frank M. Johnson, Lexington, Neb., for intervening defendant.

## DELEHANT, District Judge.

Plaintiff, as the owner of United States Letters Patent No. 2,069,873 which is said to cover a "Process for the Preservation of Organic Material" brought this action against Nebraska Farm Products, Inc., a Nebraska corporation engaged in alfalfa processing, and Ervin Burkholder, its president. Arnold Dryer Company, a Wisconsin corporation, engaged in the manufacture of alfalfa processing and drying equipment was permitted to intervene as a defendant. In his complaint, as amended, plaintiff alleged appropriate jurisdictional facts; set up the patent, his ownership, its infringement by defendants, and the giving of statutory notices on the products manufactured within the patent, and of infringement; and prayed for injunctive relief, an accounting for damages and costs and attorneys fees.

Answering, defendants admitted the jurisdictional facts, and the issuance of the patent but denied the validity of it because of anticipation and want of invention in the face of sundry cited earlier patents, several specified prior uses, publications and sales, and prior art, and for failure to point out the claimed inventions. Defendant Nebraska Farm Products Company admitted, but defendant Arnold Dryer Company denied, infringement and the giving of the statutory notices.

At the pretrial conference, upon inquiry by counsel for the defendants and intervenor, counsel for the plaintiff stated that at the trial he would rely on claims 7, 8, 9 and 10 only, of the patent in suit. With the issue of the validity of plaintiff's patent thus limited, trial of the action has been had, save upon the issue of an accounting, which was reserved pending the determination of the underlying questions of the validity of the plaintiff's patent and of defendants' alleged infringement. Counsel have assisted the court in its work by the submission of comprehensive briefs. The record before the court tenders for present answer only the validity of claims 7, 8, 9 and 10 of the patent relied upon and, if that be affirmed, the alleged infringement.

Upon careful consideration of the entire record, the court is satisfied, and finds, that plaintiff's patent, at least insofar as it is dependent upon claims 7, 8, 9 and 10 thereof, is invalid because of anticipation and lack of invention.

Claims 7 to 10, inclusive, of plaintiff's patent are set out and compared in footnotes 1 to 7 below. Close analysis of these claims indicates that they all disclose a substantially similar process, namely: The method of producing a prepared animal food which comprizes reducing[1] hay forming organic, or fresh green unripened, plants[2] to a divided, comminuted and crushed state,[3] by a cutting, shredding and crushing operation[4] sufficiently effective to bring to the surfaces of such reduced material natural cellular moisture, chlorophyl and food nutrients present in said moisture, whereby said reduced material is thoroughly commingled, moisture extracted from the cells thereof and a substantially uniform color imparted to the mass thereof;[5] then, without removal of the moisture, transferring such reduced material in its entirety to a desiccating zone, heating the reduced material while in said desiccating zone sufficiently to drive off the water content thereof,[6] but leaving in the desiccated plants the food nutrients and chlorophyl normally contained in said moisture, and removing the moisture freed reduced material in a substantially dry state from the desiccating zone.[7]

See **Notes 1 to 7** on page 775.

### Claim 7

1. The method of producing a prepared animal food which comprises reducing

2. fresh, green, unripened plants

3. to a crushed and comminuted state

4.

5. to liberate from the cellular structure of the plant so comminuted and crushed, a substantial proportion of the natural cellular moisture, coloring matter and food materials present in said moisture therein

6. and then subjecting the reduced material, without having removed said liberated moisture and while in a diffused and loose state, to the action of a fluid heat carrier, whereby to evaporate and remove only the water content naturally contained in said plants

7. without any substantial loss of food nutrients and original color

### Claim 8

The method of producing a prepared animal food which comprises reducing

green and freshly mown hay forming organic plants

to a divided state

by a combined comminuting and shredding operation

effective to bring to the surfaces of such reduced material a substantial portion of the natural cellular moisture, coloring matter and food nutrients present in said moisture

then without removing the moisture, transferring such reduced material to a desiccating zone and then while said material is in said zone in a relatively loose and free state passing a gaseous heat carrier there through to raise the temperature of the reduced material sufficiently to liberate the water content thereof only

but without causing any substantial loss of the food nutrients and coloring matter

### Claim 9

The method of producing a prepared animal food which comprises reducing

hay forming organic plants

to a divided and crushed state

by a cutting and shredding operation

sufficiently effective to bring to the surfaces of such reduced material natural cellular moisture, chlorophyl and food nutrients present in said moisture, whereby said reduced and crushed material is thoroughly commingled and a substantially uniform color imparted to the mass thereof,

then without removal of the moisture transferring such reduced material in its entirety to a desiccating zone, and heating the reduce material while in said desiccating zone sufficiently to substantially drive off the water content thereof

but leaving in the mixture without substantial diminution in quality and quantity the food nutrients and chlorophyl

### Claim 10

The method of producing a prepared animal food which comprises reducing

hay forming organic plants

to a divided state

by a cutting and shredding and crushing operation

sufficiently effective to bring to the surfaces of such reduced material natural cellular moisture, chlorophyl and food nutrients present in said moisture, whereby said reduced material is thoroughly commingled, moisture extracted from the cells thereof and a substantially uniform color imparted to the mass thereof,

then without removal of the moisture transferring such reduced material in its entirety to a desiccating zone, heating the reduce material while in said desiccating zone sufficiently to drive off the water content thereof

but leaving in the desiccated plants the food nutrients and chlorophyl normally contained in said moisture, and removing the moisture freed reduced material in a substantially dry state from the desiccating zone

Since plaintiff's claims must be viewed in the light of the prior art to determine patentability, a brief historical summary of the progress made in the process of preserving organic material prior to the time of plaintiff's discovery is, at this point, appropriate.

In 1857, John Alison, of Essex County, England, obtained British Patent No. 1875 for "Improvements in Preparing Vegetable Substance for Feeding Animals". In this patent, Alison described his invention as follows:

"Whereas grass and clover have heretofore been cut into chaff in the dried state only, these improvements consist in converting grass, clover, tares, corn, and all other suitable vegetable substances into chaff from the green state. For this purpose the grass (or other vegetable substance) after being mown is carried directly from the field to the building in which the conversion is to be carried on. The grass is then cut up into short lengths, for which purpose I employ a series of circular knives or cutters, revolving on a longitudinal shaft in contact with a second series of circular knives, or with a plain roller having incidents or spaces corresponding to the first series of knives, the space between said revolving cutters determining the length of the cut material. And although I use this form of apparatus for cutting green vegetable substances, it may also be advantageously employed for cutting hay, straw and clover in the dried state. As the grass (or other substance) is cut into short lengths it falls down into an apartment beneath, from which it is carried up by an endless chain of buckets to the upper floor of the building, and deposited in an apartment immediately over the kiln or drying floor. A quantity of the cut grass being dropped through onto the drying floor, it is equally distributed thereon by a revolving horizontal spreader; heated air is then admitted under pressure below the kiln floor, which is formed of perforated flaps or louvres. The heated air, after passing up through the green grass and depriving it of its moisture, escapes through suitable flues into the open air. When the grass is sufficiently *dessicated* (sic), the louvres of the drying floor are opened and the drief chaff falls through onto the floor beneath, from which it is gathered and deposited in suitable receptacles."

The Alison patent disclosed an apparatus adequate to perform the described process.

In 1858, the United States Patent Office issued Letters Patent No. 19,425 to W. O. Hickok, of Harrisburg, Pennsylvania, covering an apparatus for cutting and crushing cornstalks and other substances for fodder such as hay and straw. This invention consisted in the "use of a reciprocating serrated plate in connection with oblique or diagonal cutters" for the purpose of *cutting* the cornstalks; and the use of two toothed cylinders operating in combination to *crush* the cut sections of the corn stalk. The apparatus Hickok described was adequate to perform the function described.

In 1867, Charles Brown of Buffalo, New York, obtained United States Patent No. 68,345, covering his process for preparing hay and straw as cattle feed. A portion of the patent reads:

"The nature of this invention relates to the manner or process of preparing hay and straw as an improved article of food for cattle and horses.

"The first part of my process is practiced as follows:

"Cut the hay or straw quite short, say from one-fourth to one and one-half inch in length, with any suitable hay cutting machine.

"Second. For the second part of my process I have a crushing machine placed in close proximity and in such relation to the cutting machine that the cut hay or straw will fall or pass directly from the cut-

ting machine to the crushing machine, and be crushed or flattened in its passage through the machine, and thus made soft and edible.

"Third. In the third part of my process the cut and crushed hay is winnowed or subjected to a current of air, for the purpose of removing therefrom such dust, dirt, grit, and foreign matter as may be therein. For this purpose I place and arrange a blower or fan near to the cutting and crushing machines, so as to pass a current of air through and across the column of cut hay as it passes from the cutting to the crushing machine, and also so that a current of air will pass through and across the falling column of cut and crushed hay as it passes from the crushing machine to the elevator. The blower is so arranged as to pass a blast or current of air through the cut hay and also through the crushed hay or straw by a direct blast or by suction. I prefer to so arrange it as to produce the current of air by suction, substantially as represented in the drawings. A wire screen is so placed and used as to prevent the short-cut hay from being carried off by the blast of air while the dust, dirt, and foreign matter will pass through the screen freely, and thus the cut and crushed hay is winnowed and freed from dust and dirt.

"Fourth. In the fourth part of my process I press and bind the short cut, crushed, and winnowed hay into compact bales for transportation, storage, and commerce."

The Brown patent disclosed an apparatus adequate to perform the described process.

In 1881, John Commins of Charleston, South Carolina, obtained United States Patent No. 251,188, covering a process for treating salt marsh grass. His invention consisted of "taking the grass while green, passing it through suitable crushing or breaking machines, so as to disintegrate the fiber, plac(ing) the grass

thus disintegrated in tanks of fresh water, for the purpose of extracting the salt, then drying the grass, and then mixing it with bran, meal, or any other suitable material which will add nutriment to grass."

In 1892, Birney C. Batcheller of New York City, New York obtained United States Patent No. 486,806, covering an apparatus for drying materials such as brewers' grains. This apparatus consisted of

"a cylinder or drum provided internally with a number of longitudinally extending and radially-projecting curved blades or buckets which catch the material as it is fed into the cylinder and in the rotation thereof carry it from the lower side upward, so that the material is constantly falling or dropping in streams through the center or unoccupied space of the cylinder * * *. At the same end the cylinder is connected with a hot-air-supply conduit, which leads hot air, preferably heated to a high temperature, into the cylinder, so that the current is directed lengthwise through the cylinder to become intimately mingled with the material that is constantly falling or dropping in the cylinder and carry the material as it becomes dried progressively forward to the opposite end of the cylinder, where the material is discharged and the spent air and moisture conducted onward or escaping."

In 1901, Max Hecking of Dortmund obtained Austrian Patent Specification No. 5,585, covering a process for obtaining animal feed by drying beet heads and leaves. The patent contained the following description of the process:

"The success had to depend on this, that the non-uniform raw material consisting of leaves, leaf stems and beet heads are converted into a homogeneous mass. The method which accomplishes this can not consist of a simple cutting—under, which cutting is understood a com-

minution of the material by means of artificial cuts—but that the comminution to be employed requires the destruction of the organic form of leaves, leaf stems, etc.

"Such a comminution consists of a stamping of the materials by knives in any desired direction approximately in such a manner as feed is comminuted in a trough by means of stamping knives. One obtains, however, this desired result much better when the beet leaf as soon as it is harvested after a preceding hacking operation is squeezed and torn apart, so that a repeated cutting is not absolutely necessary.

"This mechanical preparation may be accomplished by devices having different constructions. As an example may serve the mode of operation of a meat cutting machine.

"The same is characterized by:

(a) In the form of its construction as a stamping, squeezing or tearing of the raw material, which operations may be combined with each other and also may be combined with a simple cutting operation, and;

(b) By its purpose, converting of the non uniform raw material into an almost homogeneous mass, namely, by means of a comminuting of the beet-heads and destruction of the organic form of the leaf surface and leaf stem. The desired condition of the raw material is considered as 'almost homogeneous' for the reason that it is not necessary to obtain a uniform dough-like mass, but rather a coarsely comminuted beet substance as long as the organic leaf form has been destroyed sufficiently.

The raw material which has been worked upon in this manner is now ready for drying and may be dried in a drying apparatus by employing a heating source of any desired high starting temperature in such a manner that no appreciable loss of the digestible nutritive substance takes place.

"Patent Claim

"Method for producing an animal feed from beet heads and beet leaves by means of employing artificial drying, in such a manner that the beet leaves and beet heads in raw condition are comminuted by squeezing, stamping or the like, but not by means of cutting, into an almost homogeneous mass, under destruction of their organic form, whereupon the mass so produced is artificially dried in known manner." [8]

In July 1909, Robert S. Rowland of Oklahoma City, Oklahoma obtained U. S. Patent No. 447,461, relating to a device for drying alfalfa. The patent discloses an apparatus which embodies a cutting mechanism for reducing the alfalfa into short lengths and a series of nine cylindrical rotating drums connected with heating coils wherein the moisture is removed from the alfalfa "without affecting its color or food quality". In July of the same year, William F. Rickey of Rocky, Oklahoma, obtained U. S. Patent No. 445,996, also relating to an alfalfa dryer. This patent related to a mechanism

"for utilizing artificial heat in effecting the drying of the alfalfa, said structure embodying means for successively pressing, cutting and heating the alfalfa to thoroughly remove the moisture and to comminute or reduce the same to the shortest lengths possible, both for food or to be subsequently ground to provide meal."

In 1909, and subsequent years, the Louisville Drying Machine Company, a manufacturer of units for drying brewer's grain sold some dryers that were

8. This is quoted from the stipulated translation of the Hecking Patent. The Patent Office translation and Carl Demricks translation of the Hecking Patent are substantially the same as the stipulated translation; consequently the court finds that this translation properly reflects the content of the patent.

used for drying alfalfa and paille finne grass. Properly authenticated company records disclose sales of six foot by twenty-five foot steam tube dryers to B. H. Strong, West Point, Mississippi, about January 27, 1910, to the Consolidated Alfalfa Milling Company at Oklahoma City, Oklahoma about March 4, 1910, to the Colorado Alfalfa Products Company at Lamar, Colorado about May 1, 1910, and to the Estate of Henry C. Minor at Houma, Louisiana, one unit about January 28, 1913 and another unit about five years later. In the use of these dryers it was necessary to prepare the material to be dried by cutting it into short lengths of about an inch or less before placing the material in the dryers.

Both Blizzard and Smalley lawn mower type cutters were used for this purpose. Although these devices were primarily cutters, there was in their operation, an incidental amount of crushing, especially if the cutting blades became dull. The only purpose of the cutting was to enable the material to be put into, and processed through, the dryer without catching in the pipes. The cut material, once placed in the Louisville Dryers, was in periodic contact with the heated steam tubes and moisture was evaporated in such a manner that in fifteen or twenty minutes the material emerged completely dry. The court specifically finds that these Louisville Dryers were actually used, in connection with the process described, for the purpose of drying paille finne grass in the United States prior to 1918.

In 1911, Francis Hayden of Granite, Colorado obtained U. S. Patent No. 573,-502, relating to a

"kiln of special structure mounted upon a running gear and so arranged that a series of the said kilns can be connected together. A conveyor is mounted for movement along the bottom of the kilns and to the terminal kiln of the series is attached a blower which is adapted to discharge blasts of air upon the batch of hay as it is ejected from the drier and also the said blower is so arranged as to remove from the hay the products of evaporation and discharge the same from the kiln."

In 1914, George B. French of Fremont, Nebraska obtained U. S. Patent No. 1,-105,415 relating to a

"process of preparing a stock food consisting in cutting and shredding all the parts of a food plant which grow above the ground and have nutritious qualities, drying the cut and shredded mass and grinding the dried product into a comminuted form."

In 1916 Arthur W. Koon and James G. Boswell of Paradis, Louisiana commenced work on apparatus for drying hay, grain and like materials. In 1921 Boswell obtained United States Patent No. 1,370,513, covering this apparatus. The patent described the objectives of the apparatus as follows:

"The principal object of the invention is to provide a drier which will effectively remove all of the moisture from the material at a minimum expense.

"Another object of the invention is to provide a drier which is first arranged to pass a blast of air through a furnace and then carry the same into a charger where the grain is admitted to the air and carried through a suitable pipe into a drying drum or cylinder which is kept in continuous rotation and is provided at its end with an air outlet opening or hood which is arranged to conduct the warm air to the atmosphere and leave the grain free to be dumped onto a conveyor or any other suitable means by which the same is carried away from the device.

"A still further object of the invention is to provide a means for controlling the speed of the passage of the material through the drum or cylinder which speed is controlled by the raising or lowering of the discharge end of the device."

The apparatus described in the patent was actually constructed and performed the beforementioned function with commercial success prior to 1920. In the operation of the dryer constructed by Koons and Boswell, leaf crops, such as clover, alfalfa, soy beans, and corn, were cut in the field and brought to the dryer. Prior to being placed in the dryer these materials would be reduced in size or altered in shape by a Ross Cutter, or a W. W. Hammermill, or a home made device constructed by Koons and Boswell which consisted of breasted circular saws.

The Ross cutter consisted of a traveling feed table working up to two rolls that conditioned, held, and fed the material while it was cut to approximately one-eighth inch lengths by a lawn mower type spiral knife head which rotated on its axis at seven hundred revolutions per minute. On some occasions prior to 1918 Koons and Boswell used a re-cutter screen in connection with the Ross cutter and the material was pulverized in such a manner that, bleeding its moisture, it became a gummy plastic mass, prior to being placed in the Boswell dryer. The use of the Ross cutter on alfalfa did not produce desirable results because the alfalfa would be broken down so fine that it would choke the cutter head and teeth and other operating parts.

The W. W. Hammermill consisted of fixed hammers, or straight bars in a threshing machine cylinder type arrangement surrounded by a screen. The U. S. Hammermill thoroughly sheared or comminuted the material; and did not work successfully on green alfalfa.

The home made device, consisting of breasted circular saws, cut the material much finer than either the Ross Cutter or W. W. Hammermill. The breasted saws were so close together that the material was literally reduced to "saw" dust.

After the material was reduced by one, or another, of the methods described, it was placed in the Boswell dryer and dried. The process described was carried on prior to 1918 and there was considerable success in drying paille finne grass.

On April 8, 1919, Max F. Manglesdorf of Union Hall, New Jersey, obtained United States Patent No. 1,299,492, relating to an apparatus for dehydrating. The patent contains the following description of the invention:

"The invention relates to methods of and apparatus for the drying of vegetable and other material in or reduced to reasonably small pieces, as, for illustration cossettes, shreds, slices, or the like; and my invention provides a new and highly efficient method or process, as well as apparatus, for the drying of such materials comprising in the preferred practice the continuous travel of a body of said material from one end to the other of a rotating drum, the constant turning over of said material on its passage through said drum from the inlet end thereof to the discharge therefrom for the finished material and the forcible passage through said drum, from the outlet end thereof for the material, of a body of properly heated air, said air being regulated as to temperature and volume and passing, under requisite pressure, through said drum and the material traveling through the same, and the air moving in counter direction to the travel of the material and thoroughly engaging the surfaces of the same. The air first engages the driest portion of the material approaching the point of discharge therefor and thence through the moving body of material and finally being discharged from the apparatus, with the use of which my invention may be carried into effect, at or nearly at the temperature of the outside air and with its moisture content increased to or nearly to the point of saturation at that temperature. I will preferably regulate the volume of air automatically with the use of a humidostat, and the temperature of the heated air

entering the apparatus should be maintained substantially constant and at a degree suitable to the material under treatment, and this step may be attained automatically with the use of a thermostat. The process or method followed by me consists in submitting the raw material on its entrance to the drying chamber, to the action of a current of air then of high relative humidity and of a temperature but little higher than that of the material itself, and then (during the travel of the material) of gradually higher temperature and lower relative humidity progressively from the inlet of said material to its discharge from the apparatus through which it passes in substantially constant flow, until the material has become dehydrated to such a degree as is sufficient for its preservation; dehydration being slow at first and progressive, rupture of the cell walls by explosion avoided and the cell contents preserved uninjured, so that if thereafter the requisite amount of moisture be restored to the product, it will recover its original appearance, volume and flavor without loss of its nutritive properties.

"In carrying out my process I introduce the material to be dehydrated in reasonably small pieces in substantially constant flow into one end of a rotating cylinder and cause the same to travel, in proper timing, to the other or discharge end thereof, and at the same time cause the passage of properly heated air through said cylinder from the discharge to the inlet end thereof, whence said air after having acted on the material under treatment escapes to the open atmosphere, and during the travel of the material through the rotating cylinder, the material is turned over and over and over again, so that all of its surfaces may become exposed to the air passing through the cylinder. The heated air progressively acts, commencing

with the discharge end of the cylinder, upon the driest portions of the material, and then on its further travel through the cylinder upon the approaching progressively more moist portions of the material, and this I regard as important, because if the highly heated air acted first on the more moist or raw portions of the material, the dehydrating effect would not be at all satisfactory."

In 1919 Numa C. Hero, constructed an apparatus at Fort St. Leon, Louisiana, for drying foodstuffs. He acquired the first patent, U. S. No. 1,358,313, covering this apparatus, November 9, 1920, and the second patent, U. S. No. 1,403,778, on January 17, 1922. The apparatus, as constructed, and as disclosed by the patents, was the subject of an article appearing in the November, 1927 issue of the Country Gentlemen at page 44. A portion of the article reads as follows:

"Now for a brief mechanical description: the principle of operation is similar to the one used in making cement. That is, a long large revolving cylinder with another cylinder on the inside forms the main part of the dryer.

"Both cylinders revolve in the same direction. Between the walls of the cylinders there is a wide space and it is through this space that the burnt gases and smoke from the furnace pass on their way to the chimney. This heats the inner cylinder. The gas and smoke do not come in direct contact with the material to be dried.

"The grass is cut in the field as usual and delivered to an ensilage cutter which cuts it into short lengths and blows it into a hopper or elevator bin. It is necessary to cut the material in short lengths because of the way it is handled through the dryer—that is by an air blast. The finely cut grass is delivered by a screw from the hopper to a high speed fan. Here it comes in direct contact with the hot air which is

sucked by the fan through the hot-air flues. This air reaches a temperature of about 300 degrees.

"The air is blown through the center tube at a rapid rate—the claim being forty miles an hour. The grass is partly dried by the time it reaches the other end of the cylinder, where it drops from the center tube into the inside cylinder. A series of vanes set at the proper angle gradually move the material toward the rear end of the dryer as the cylinder revolves.

"The small particles are dried first and picked up by air current and carried out by the second fan, which delivers the dried material to the storage house."

Hero operated this drying apparatus commercially for two or three years during which time he dried most paille finne grass. The process used in the operation of the Hero dryer was very similar to the process used in the operation of the Boswell dryer, except that a Smalley, instead of a Ross, or other, comminuting device was used, and the temperatures in the Hero dryer reached 300° F, not just 200° F, as in the Boswell.

Against this background of developments in the art of drying forage crops, plaintiff, in 1922 or 1923, commenced work on the process, which ultimately became the subject of the patent in suit. The first experiment with his process actually occurred in about 1928. He chopped alfalfa and ran it through a meat grinder and then manually placed the comminuted and crushed material in a batch dryer to be dried. On September 21, 1929 he filed a petition with the Commissioner of Patents to obtain a patent for this process and an apparatus which plaintiff described as capable of performing the process. The apparatus described consisted substantially of a batch dryer, including heating element and air circulating fan; a meat grinder type of reducing machine and a screw conveyor to carry the ground material from the grinder to the dryer. In all, plaintiff's patent petition contained 15 claims, some relating to the process and some relating to the apparatus. On March 30, 1930, the examiner in charge of plaintiff's application advised plaintiff's attorney that,

"Division is required between (I) claims 1-6 and 10-13, inclusive drawn to a drying apparatus classified in class 34, Driers and (II) claims 7-9, inclusive, 14 and 15 drawn to a process for preparing forage material classified in class 99, Preserving. These are separate and distinct inventions in that the process can be carried out by apparatus other than that described."

Whereupon plaintiff's attorney on August 23, 1930, requested cancellation of all claims relating to the apparatus, and commission action on all claims relating to the process.

On April 28, 1931, the examiner in charge of plaintiff's application advised plaintiff's attorney that:

"The claims, 7 to 9, 14 and 15 [9] are rejected as lacking invention over the patent to Leftwich [10] which discloses a process of treating green organic plant material comprising destroying the cellular structure of the plant material by pressure to remove a portion of the moisture and subjecting the crushed material to the action of a drying fluid to further reduce the moisture content to the desired amount. The crushing of the green material necessarily

9. These do not refer to any of the claims in suit.

10. This refers to United States Patent No. 1,568,339 issued to Jesse H. Leftwich of Chicago, Illinois on January 5, 1926, and disclosing:

"A process of producing an alimentary product which comprizes first reducing the moisture content of the water hyacinth plants by pressure" (or a macerating or crushing operation), "then reducing their moisture content by heat to a proportion inadequate for decomposition, without material alteration of their composition."

causes a distribution of the coloring and soluble food constituents thru-out (sic) the plant material. More-over, in this respect, attention is directed to lines 114–124, page 2 of the patent to Sharp,[11] wherein it is disclosed that the pressing of forage material distributes the moisture or plant juices and flavoring uniformly throughout.

"The patent to Ponsar [12] is cited to show it to be old to pass green plant material thru (sic) a series of driers and grinders in the preparation of a cattle food."

On May 12, 1931, Oscar Erf of Columbus, Ohio, obtained United States Patent No. 1,804,602 covering, among other things:

"The process of treating green plants constituting cattle feed consisting in topping said plant, promptly subjecting the toppings to a crushing and shredding action and then promptly subjecting them to a pulverizing action together with heat and carboniferous gases."

The patent disclosed an apparatus adequate to perform the function described.

On August 4, 1931, Everett B. Cushman of Hollywood, California, obtained United States Patent No. 1,816,998 covering,

"The method of curing alfalfa and the like, which comprises cutting the plant when fresh and green, crushing the plant to release liquid contained in the cells thereof and then allowing the crushed plants to dry, the crushing and releasing of liquid serving to accelerate drying of the plant."

This patent does not contain a description of any apparatus designed to perform the claimed process.

On October 28, 1931, plaintiff, amended his application for a patent by requesting cancellation of all previous claims and substituting new claims, 16–19, inclusive. These claims are substantially similar to, but not identical with, the claims in suit.

On April 28, 1932, plaintiff's attorney was advised by the examiner in charge of plaintiff's application that claims 16–19, inclusive, were "rejected as being directly anticipated by Cushman and Erf".

On October 31, 1932 plaintiff's application for a patent was amended by adding claims 20–25, inclusive, (corresponding to claims 4 and 1–3, of the patent to Erf.) Claims 26–29, inclusive were rejected and claims 20–25 were finally allowed on December 23, 1932. An interference proceeding involving plaintiff's claims 20–25, and Cushman's claims 1–6, ensued, and a declaration of priority in favor of plaintiff was entered June 18, 1935.

On December 16, 1935, plaintiff's attorney requested that the examiner cancel the rejected claims and pass the application to issue. The application, to the extent that it contained only the six claims (20–25), was allowed.

On March 27, 1936, plaintiff requested further consideration of his application as amended on that date. This amendment contained sixteen additional claims, numbered 30 to 45, inclusive. On April 1, 1936 the examiner advised plaintiff's attorney that claims 20–25 were allowed and claims 30 to 45, inclusive were rejected. On July 15, 1936, plaintiff made the final amendment to

11. The cited portion of U. S. Patent No. 1,395,746, issued to Lee Sharp, November 1, 1921 reads:
"The described fodder-meal or stover-meal is preferably subjected immediately to a high compression, such as described in my application for patent on forage products and process for making same, filed November 7, 1918, Serial No.

261,729, whereby to redistribute the moisture or plant juices and flavoring and coloring material uniformly through the mass, and also to reduce the bulk of the material and enable packing, shipping or storing thereof in minimum space."

12. United States Patent No. 1,056,297 issued March 18, 1913.

his application. This amendment contained claims 20 to 25, inclusive, and 42–48, inclusive, which are the identical claims 1 to 13, inclusive, contained in plaintiff's patent.[13] This application as finally amended was allowed on July 27, 1936, and on February 9, 1937, the patent in suit was issued to plaintiff.

The mere issuance of the patent in suit gives rise to a presumption of the validity of plaintiff's claims; and the burden of establishing invalidity rests heavily upon the defendant. 35 U.S.C. (1952 Ed.) 282; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983. However, in this case that burden has been met. The court, having resolved every reasonable doubt in favor of patentability, General Electric Supply Corp. v. Maytag, 8 Cir., 1938, 100 F.2d 218, has concluded that the claims in suit are invalid for the reasons hereinafter stated.

(1) *Anticipation.* Section 31 of Title 35 U.S.Code (1946 Ed.), 35 U.S.C.A.Appendix, § 31, provides:

"Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof, or who has invented or discovered and asexually reproduced any distinct and new variety of plant, other than a tuber-propagated plant, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than one year prior to his application, and not in public use or on sale in this country for more than one year prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor."

The claims contained in plaintiff's patent fail to meet the requirements of the quoted section.

(a) *Prior Patents.* Austrian Patent No. 5,585, was issued to Max Hecking in 1901 more than 20 years before plaintiff commenced work on his process and approximately 28 years before plaintiff filed his application for the patent in suit. The time requirement for anticipation by the Hecking Patent is clearly established. The only real issue is whether the Hecking patent sufficiently disclosed the process claimed by plaintiff. The court is inclined to the view that it did. " 'In order to be an anticipation of a United States patent, a foreign patent must disclose the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of experimentation.' " Wisconsin Alumni Research Foundation v. George A. Breon & Co., 8 Cir., 85 F.2d 166, 167; Donner v. Sheer Pharmacal Corporation, 8 Cir., 64 F.2d 217, 220. The Hecking patent discloses substantially the same process for drying organic material that is disclosed in plaintiff's claims. Of course, the specifications of the two patents are not exactly the same. Precise identity between the claims and specifications of the domestic and foreign patent is not required; substantial identity is sufficient. Hollywood-Maxwell Co. v. Streets of Tulsa, 10 Cir., 183 F.2d 261; Electric Storage Battery Co. v. Shimadzu, 3 Cir., 123 F.2d 890. The fact that the Hecking patent relates to a process for drying "beet heads and leaves" does not preclude it from being anticipatory to plaintiff's process for drying "green and freshly mown hay-forming organic plants". The steps comprising the process are the essential features for consideration in determining the validity of a process patent over a prior patent, not the particular material to which the process is applied nor the particular substance obtained by its application. Application of Swain, 154 F.2d 118, 33 C.C.P.A., Patents 833.

13. Notes 1–7, supra.

"A process does not become patentably new merely because it is applied to a different object or material." In re Williams, 87 F.2d 499, 501, 24 C.C.P.A., Patents, 861.

Both the Hecking and plaintiff's processes involve the same basic steps. As soon as the material to be dried is harvested, and while it is still in a fresh green condition,[14] it is reduced to a crushed and comminuted state [15] and the reduced material is subjected to the action of a heat carrier [16] in such a manner that there is no substantial loss of food nutrients.[17] If the claims of the patent in suit were valid, one operating under the process described by Hecking would infringe. Thus, the classical test of anticipation is met. American Fruit Growers, Inc., v. Brogdex, 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801.

The process disclosed in plaintiff's patent is substantially identical to the processes disclosed in U. S. Patent No. 1,804,602 issued to Oscar Erf of Columbus, Ohio, May 12, 1931 and U. S. Patent No. 1,816,998, issued to Everett B. Cushman [18] of Hollywood, California August 4, 1931. Both of these patents establish the defense of anticipation unless the proceedings before the United States Patent Office preclude defendant from asserting the priority of these patents as a defense to the present action.

Erf applied for his patent July 18, 1927; and Cushman for his October 21, 1927. In connection with his application for a patent, plaintiff filed an affidavit under former Rule 75, Rules of Practice in Patent Cases [Now Rules of Practice in Patent Cases, 35 U.S.C.A. Appendix, § 131] asserting that he had completed his invention prior to the time that Erf and Cushman filed their patent applications. The patent office set up an interference proceeding between plaintiff

---

14. The patents read:

| Hecking's | Plaintiff's |
|---|---|
| "when the beet leaf as soon as it is harvested after a preceding hacking operation * * *." | "green and freshly mown hay forming organic plants * * *." See also footnote 2. |

15. The patents read:

| Hecking's | Plaintiff's |
|---|---|
| "Such a comminution consists of a stamping of the material by knives in any desired direction approximately in such a manner as feed is comminuted in a trough by means of stamping knives. One obtains however this desired result much better when the beet leaf * * * is squeezed and torn apart, so that a repeated cutting is not absolutely necessary. | "by a cutting and shredding operation * * whereby said reduced and crushed material is thoroughly commingled." See also footnotes 3, 4 and 5. |

16. The patents read:

| Hecking's | Plaintiff's |
|---|---|
| "The raw material which has been worked upon in this manner is now ready for drying and may be dried in a drying apparatus by employing a heating source of any desired high starting temperature." | "then subjecting the reduced material * * to the action of a fluid heat carrier * * *." See also footnote 6. |

17. The patents read:

| Hecking's | Plaintiff's |
|---|---|
| "In such manner that no appreciable loss of the digestible nutritive substance takes place." | "without any substantial loss of food nutrients and original color." See also footnote 7. |

18. Cushman assigned all of his interest in the patent, prior to its issuance, to Food Machinery Corporation of San Jose, California.

and Cushman [19] and declared priority in plaintiff. However, this decision is not res judicata as to defendants herein; nor does it operate to estop them from asserting the priority of the Cushman patent since defendants were not parties to the interference proceeding. See Rousso v. First National Bank, 6 Cir., 37 F.2d 281; Radio Corporation of America v. Radio Engineering Laboratories, 2 Cir., 66 F. 2d 768. The interference decision, and the issuance of plaintiff's patent in spite of the outstanding patents of Cushman and Erf are not without significance. In the absence of very strong proof to the contrary the court would be constrained to find that plaintiff had completed his invention prior to the applications by Cushman and Erf. The mere issuance of the patent to plaintiff requires this. However, plaintiff's own testimony convinces the court beyond practical doubt that he did not complete his invention [20] until a year or more after both Cushman and Erf had filed their applications for patents.[21] This effectively overcomes any probative significance that might be attached to the action of the Patent Office; and the court necessarily concludes that plaintiff's patent was anticipated by the Cushman and Erf patents.

(b) *Prior Knowledge or Use.* Defendants assert that plaintiff's patent is invalid because the process contested was known and used by others in this country long before plaintiff's alleged invention, citing 35 U.S.C.(1946 Ed.) § 31; Coffin v. Ogden, 18 Wall. 120, 85 U.S. 120, 21 L.Ed. 821; Brush v. Condit, 132 U.S. 39, 10 S.Ct. 1, 33 L.Ed. 251. This contention is without adequate factual support. Although Numa C. Hero, Arthur W. Koons, and others engaged in the process of cutting and drying paille finne grass, it appears that none of them crushed or shredded the material to be dried. Bringing the cellular moisture to the surface by crushing or shredding is a key factor in plaintiff's process; consequently the court is unable to find from the evidence that plaintiff's process was anticipated by prior knowledge or use.

(c) *Prior Publications.* The court is unable to find that plaintiff's process was anticipated by prior publications for the same reason that it could not find anticipation by prior knowledge and use. The article appearing in the November 1922 issue of the Country Gentlemen relates to a "cutting" and drying process as distinguished from a "crushing or shredding" and drying process.

(2) *Lack of Invention.* Even if the court were to assume, which it can not, that plaintiff's patent had not been anticipated, the court would be required to declare the patent invalid for want of invention. As stated by Mr. Justice Douglas in Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, at page 90, 62 S.Ct. 37, 40, 86 L.Ed. 58:

> "Under the statute, 35 U.S.C. § 31, 35 U.S.C.A. § 31, R.S. § 4886, the device must not only be 'new and useful', it must also be an 'invention' or 'discovery'. Thompson v. Boisselier, 114 U.S. 1, 11, 5 S.Ct. 1042, 1047, 29 L.Ed. 76. Since Hotchkiss v. Greenwood, 11 How. 248, 267, 13 L.Ed. 683, decided in 1851, it has been recognized that if an improvement is to obtain the privileged position of a patent more ingenuity must be involved than the work of a mechanic skilled in the art (cases cited)."

Stated simply, a patentee is presumed to have had before him all of the prior art at the time he made his alleged invention, and patentability is not present if any one skilled in the art would find obvious, or be taught from the prior art, the process in question without the exercise of inventive faculties. See 69 C.J.S., Patents, § 53(b), p. 259 et seq. Consid-

---

19. But not between plaintiff and Erf.

20. With regard to when an invention is complete, see T. H. Symington Co. v. National Malleable Castings Co., 250 U.S. 383, 39 S.Ct. 542, 63 L.Ed. 1045.

21. Statements to the contrary, contained in plaintiff's affidavits filed with the Patent Office are rejected as false.

ering the state of the art of drying forage crops in 1928, plaintiff's discovery can hardly be said to have resulted from a "flash of inventive genius". [22]

■ The following patents cited by defendant disclose processes in many respects, strikingly similar to that described in the patent in suit: British Patent No. 1875 covering a process for drying grass, clover, tares and corn issued to John Allison in 1857; U. S. Patent No. 251,188 covering a process for treating salt-marsh grass issued to John Com-

mins in 1881; U. S. Patent No. 940,193 covering an apparatus for treating alfalfa issued to William Rickey in 1909; and U. S. Patent No. 1,299,492 covering an apparatus for drying vegetables and other material issued to Max Manglesdorff in 1919. [23]

At least two important steps in plaintiff's process (dividing, and drying) were long and exceptionally well known in the trade. For patents disclosing a comminuting, dividing, cutting, crushing or shredding process applicable to organic material see:

| Country | Patent No. | Patentee | Year Issued |
| --- | --- | --- | --- |
| British | 1875 | Allison | 1857 |
| U. S. | 19,425 | Hickok | 1858 |
| U. S. | 68,345 | Brown | 1867 |
| U. S. | 628,287 | Smalley | 1899 |
| U. S. | 944,172 | Bond | 1909 |
| U. S. | 1,056,297 | Ponsar | 1913 |

For patents disclosing a drying process applicable to organic material see:

| Country | Patent No. | Patentee | Year Issued |
| --- | --- | --- | --- |
| British | 1875 | Allison | 1857 |
| U. S. | 68,345 | Brown | 1867 |
| U. S. | 486,806 | Batcheller | 1892 |
| U. S. | 928,541 | Rowland | 1909 |
| U. S. | 980,252 | Hayden | 1911 |
| U. S. | 1,105,415 | French | 1914 |
| U. S. | 1,264,955 | Mason | 1918 |
| U. S. | 1,299,492 | Manglesdorff | 1919 |
| U. S. | 1,307,075 | Betlon | 1919 |
| U. S. | 1,358,313 | Hero | 1920 |
| U. S. | 1,370,513 | Boswell | 1921 |
| U. S. | 1,403,778 | Hero | 1922 |

In view of the state of the art in 1928 as disclosed by all of the evidence in this case it cannot be said that plaintiff brought anything to light "which was hidden from vision" or which anyone skilled in the trade could not have uncov-

ered without the exercise of inventive genius.

For the reasons stated the court has concluded that the patent in suit is invalid, and that this case should be dismissed.

22. See Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U. S. 147, 155, 71 S.Ct. 127, 95 L.Ed. 162.

23. It will be noted that some of these patents relate to devices, as distinguished from processes. A device patent may be considered to teach a process, or even anticipate a process patent, where such device in its normal and usual operation will perform the function of the process. In re Ernst, 150 F.2d 133, 32 C.C.P.A., Patents, 1106, in which Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968, is soundly distinguished.

Counsel for the defendant, Nebraska Farm Products, Inc., will prepare, and submit to the court for approval, the appropriate judgment to be entered in keeping with the thought of this memorandum.

The clerk will transmit forthwith by United States mail copies of this memorandum as follows, one to Mr. Thomas E. Scofield, one to Messrs. Crosby & Crosby, one to Mr. C. Earl Hovey, one to Mr. Arthur L. Morsell, Jr., and one to Mr. Frank M. Johnson. In that way at least one attorney representing each party, including both Nebraska attorneys, will receive copies. And those receiving copies may entrust them for perusal to their associates. Mechanical obstacles prevent the court from making, besides the original hereof, enough copies for complete distribution and for all attorneys entered in the action. And it is considered inappropriate to require the clerk to make additional copies.