44 C.C.P.A.(Patents)
**Application of Eugene Edward MAGAT.**
**Patent Appeal No. 6217.**

United States Court of Customs
and Patent Appeals.
Jan. 9, 1957.

Carl A. Hechmer, Wilmington, Del., for appellant.

J. Schimmel, Washington, D. C., for Commissioner of Patents.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON, retired, Judges.

WORLEY, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of claims 1 to 8, inclusive, of appellant's application for a patent on a process of preparing polyamides, on the ground of lack of invention over the prior art. Claim 1 is representative of the appealed claims and reads:

"1. A process for preparing a polyamide which comprises bringing together an organic diamine in one liquid phase and an organic dicarboxylic acid halide in a second liquid phase immiscible with the first phase, mixing the liquid phases to form a system comprised of two liquid phases such that the diamine and acid halide are in separate phases and at least one of the phases includes a liquid diluent, and maintaining the phases in admixture until an interphase condensation polymerization has taken place with formation of a spinnable polyamide."

The following references were relied on by the board:

I. G. Farbenindustrie (Fr.) 892,361, January 7, 1944; Bayer-Angewandte Chemie, September 1947, pages 257–260; De Bell et al., German Plastics, Practice, 1948, pages 283, 284, 289 and 290.

Appellant's application relates to a method of producing a spinnable polya-

mide of the class commonly known as nylon which consists essentially in bringing together an organic diamine in one liquid phase and an organic dicarboxylic acid halide in a second liquid phase immiscible with the first, to form a two phase system, and maintaining them under such conditions that an interphase condensation polymerization takes place, with formation of a spinnable polyamide.

The I. G. F. French patent discloses processes for preparing polymethanes of high molecular weight by a reaction between a diamine and a dichlorocarbonate derivative of a dihydroxy alcohol. The seventh example given in the patent comprises the bringing together of a solution of bis-chlorocarbonate of 1.4 butane diol in benzene and an aqueous solution of 1.6 hexamethylene diamine, to which sodium hydroxide is added, with rapid agitation. As pointed out by the board, this procedure involves the use of two liquid phases, with each of the reactants dissolved in one phase but not the other.

We are in agreement with the Patent Office tribunals that the manipulative steps set forth in the appealed claims are disclosed in all material respects by the French patent. The issue to be determined, therefore, is whether the substances disclosed by that patent are so related to those recited in the claims that the idea of applying the procedure of the patent to the latter substances would have been obvious to a person skilled in the art at the time when appellant's alleged invention was made.

The reactants and products of the reference and the application are correctly set forth in appellant's brief in simplified comparative form as follows:

Reference:

A (Diamine) + B (Bischloroformate) ⟶ A B (Polyurethane)

Invention:

A (Diamine) + C (Dicarboxylic acid chloride) ⟶ A C (Polyamide)

From the above, it will be seen that while the application and reference both employ a diamine as one reactant, the second reactant and the final product differ. There appears to be a substantial difference of opinion as to just what degree of similarity exists between the second reactants and the final products in the two cases.

The examiner was of the opinion that polyurethane is a polyamide of the kind recited in the appealed claims, and that the term "organic dicarboxylic acid halide," which appears in each of the claims, is broad enough to include the dichlorocarbonate of a diol (also referred to in the record as bis-chlorocarbonate and bis-chloroformate) disclosed in the French patent. The board disagreed with the examiner on both points and added that "we are accordingly of the opinion that the claims should not be read as anticipated by the French patent alone." However, the board did agree with the examiner that the claims do not define invention over what is disclosed in the French patent, concluding that "It is, however, our opinion that obvious chemical similarities and the De Bell et al. citation, to which may be added the Bayer publication relied on by appellant, establish an analogy and similarity between the polyurethanes of the French patent and the polyamides here contemplated." The board did not point out the "obvious chemical similarities" and did not explain the pertinence of the De Bell and Bayer citations.

While similarity between two products may be a factor in determining whether it would be obvious to a person skilled in the art that they could be made by similar processes, it is by no means conclusive.

The claims here are directed to processes and in such a case, as was said

in In re Swain, 154 F.2d 118, 120, 33 C. C.P.A.Patents, 833, *"the steps comprising the process* are the essential features for consideration in determining the right of appellants to a patent—not the particular material to which the process is applied nor the particular substance obtained by its application." (Italics quoted.)

Whether it would be obvious that a process of making polyurethanes could be adapted to the production of nylon-type polyamides depends primarily on the relationship between the processes by which those compounds were formerly produced. If it was common, before the invention disclosed by the French patent, to produce polyurethanes and nylon-type polyamides by the same or closely parallel processes, then it might reasonably be expected to occur to a skilled worker in the art that a process of making polyurethanes could well be modified to produce nylon-type polyamides. On the other hand, if those compounds had been produced by entirely distinct processes, there would seem to be no reason why the discovery of a method of producing compounds of one class should suggest an attempt to produce those of the other class by similar methods.

As to the conventional method of preparing polyurethanes, it is stated in the board's decision that "The polyurethanes are ordinarily formed from a diisocyanate and a dihydroxy compound such as butane diol. This is apparent from the De Bell et al. citation." That statement is supported by the record and appears to be correct. On the other hand, the board states that nylon-type polyamides "are ordinarily produced by condensation of a diamine, such as hexamethylene diamine (having the amine groups at the two ends of the 6 carbon atom chain) with a dicarboxylic acid such as adipic acid or a derivative thereof." That statement also appears to be in accordance with the record.

As to the manipulative steps involved, Bayer states that in producing polyurethanes, "In contrast with the case of polyamides we can work in open vessels, for the admission of atmospheric oxygen does not cause any brown coloration of the molten polyurethane," and that "Because of its 'gentle' method of preparation, perlon U is more uniform in polymerization than nylon and polycaprolactam. The distribution of the polymer homologs in the 'melt' and in the 'solvent'-polymethane is considerably different." Bayer also says of the process for making polyurethanes that "a very essential difference, in comparison with the usual polymerization process, consists therein, that the molecular linkages are brought about not through carbon but through the hetero-atoms oxygen and nitrogen."

As indicated by the foregoing quotations, Bayer points out that polyurethanes, in contrast to nylon-type polyamides, may be produced in open vessels and by a "gentle" method which he evidently regards as an advantage in favor of polyurethanes. It would appear that Bayer is a skilled worker in the art, and the fact that he does not suggest that this advantage could be obtained in the case of polyamides by adapting the polyurethane process to them seems to indicate that such adaptation was not obvious to him, notwithstanding the fact that the French patent relied on in the instant case was issued more than three years prior to the date of the Bayer article and was presumably available to him.

The examiner stated that the process claimed here and that of the French patent involve "the same reacting radicals which react identically in the appealed claim and the reference." However, the fact that if the process of the French patent were adapted to the production of spinnable polyamides, the reacting radicals might be found to be the same is not conclusive evidence that there was no invention in making the adaptation. The primary question, as above indicated, is whether polyurethanes and spinnable polyamides were so related that a skilled worker in the art, looking for an improved process of making the latter, could reasonably be expected to search the art relating to the former for sug-

gestions. If he could not, then the fact that some similarity in reactions might have been discovered if he had done so would not necessarily be controlling on the question of invention.

Appellant emphasizes the fact that the interphase condensation, recited in each of the appealed claims, is disclosed more or less incidentally in the French patent, since some of the examples given include it and some do not, and no particular emphasis is placed upon it. This alone could not destroy the value of the patent as a reference, since the inclusion of examples which do not disclose a claimed invention does not vitiate the anticipatory effect of other examples which do disclose it. However, in determining whether the French patent would suggest to a skilled worker in the art the idea of applying interphase condensation to the production of polyamides of the nylon type, the fact that the patent does not appear to attribute any special advantage to that feature is a factor which may properly be considered. Since the reference does not teach that interphase condensation has any special or unusual value in the production of polyurethanes, there would appear to be no clear reason for applying that feature to the production of other substances.

██ The question as to whether invention would be involved in applying or adapting a prior art process of producing one chemical substance to the production of another is one which must be determined on the basis of the particular circumstances of the individual case involved. Upon careful consideration of the circumstances of the instant case, we are of the opinion that it has not been satisfactorily shown that it would be obvious to a skilled worker in the art that the processes shown by the French patent for producing polyurethanes by interphase condensation could be adapted to the production of spinnable polyamides.

The decision of the Board of Appeals is reversed.

Reversed.

JACKSON, Judge, retired, recalled to participate in place of COLE, Judge.

O'CONNELL, Judge, was present at the argument of this case but, because of illness, did not participate in the decision.