Elizabeth N. GRAHAM

v.

JULES MONTENIER, Inc.

No. 50 C 1702.

United States District Court
N. D. Illinois.

Sept. 15, 1954.

Kirkland, Fleming, Green, Martin & Ellis, Chicago, Ill., Emil K. Ellis, New York City, Carl S. Lloyd, Chicago, Ill., Abraham J. Heller, Brooklyn, N. Y., Harry Sommers, Newark, N. J., Jonas Ellis, New York City, for plaintiff.

Sidney Wallenstein, Chicago, Ill., Alan N. Mann, New York City, William E. Lucas, Chicago, Ill., for defendant.

HOFFMAN, District Judge.

This is an action for the alleged infringement of United States Patent No.

2,492,085 issued on December 20, 1949, to Elizabeth Arden, Inc., on an application filed May 6, 1947, by one Carl N. Andersen, then employed by Arden. Subsequently the patent was assigned to the plaintiff (who does business under the name of "Elizabeth Arden"). The suit was defended by Reheis Company, Inc. (formerly known as Schofield Donald Co.), which sold to the defendant a commercial product known as Chlorhydrol, the active ingredient in the alleged infringing composition.

To the complaint of the plaintiff, the defendant filed an answer praying that the patent be held invalid and denying infringement. The defendant also filed a counterclaim for a declaratory judgment declaring the patent to be invalid. The plaintiff answered the counterclaim denying all of its material allegations.

The patent in suit deals with the use of a specific form of basic aluminum chloride in antiperspirants. The defendant is a manufacturer of cosmetics doing business in Chicago, Illinois. Among other products it manufactures an antiperspirant known as "Stopette" and also antiperspirants in other forms.

The defendant contends that the patent in suit involves no invention because all that Andersen did was to substitute one form of basic aluminum chloride for another form of basic aluminum chloride that had been used in the prior art and that he did this just as soon as the new form was available to him. The defendant also takes the position that everything of substance contained in the Andersen patent was in fact worked out by Schofield Donald Co. and that the essential idea was communicated to Andersen before he did any work with the basic aluminum chlorides with which the parties are concerned in this suit.

There seem to be three major issues in this case:

1. Is the basic aluminum chloride sold by Reheis Company, Inc., the same as that described in the Andersen patent?

2. Who first found that aluminum chlorohydrate is an effective antiperspirant?

3. Is the use of aluminum chlorohydrate as an antiperspirant an invention in view of the prior art? And tied in with this problem is the question of whether or not the combination of aluminum chlorohydrate with an emulsifier is an invention.

1. *Is the basic aluminum chloride sold by Reheis Company, Inc., the same as that described in the Andersen patent?*

To answer this question we must first ask: How can a new chemical material be characterized for patent purposes? Either of two methods seems to be acceptable: (a) a complete and correct molecular formula; or (b) a detailed description of how the substance can be made. The evidence shows that Andersen tried to use both methods in his patent, but that he was incorrect in his description by either approach. There is no doubt that the material described in his patent is not the material he actually used and it is equally clear from the evidence that the material supplied by Reheis is not that described in the patent.

(a) Aluminum chlorohydrate is described to a first approximation by Reheis and by Andersen as a basic aluminum chloride with a ratio of 2:1 for $Al:Cl$. However, the evidence of both the plaintiff and defendant discloses that the statement does not define the material because there can be numerous substances with very different properties having this ratio of $Al:Cl$. It is necessary, therefore, to find a more detailed formula. The patent states that the probable formula of aluminum chlorohydrate is $Al_6(OH)_{15}Cl_3$. The evidence is not consistent with the formula set forth in the patent. The plaintiff's witness Snell (Record, 172, 747) described conductivity measurements from which he concluded that the actual formula must be eight times that of the simple formula, i. e., $[Al_2(OH)_5Cl]_8$. If this conclusion is warranted, the molecular

formula becomes substantially different from that given in the patent. The methods of estimating molecular size described by Neville (Record, 482 et seq.) seem more convincing than those of Snell. Neville concludes that the molecular size is more nearly 60 times that of the simple formula. In any event, the difference between Snell and Neville is only one of degree. The testimony of both expert witnesses proves that the formula given in the Andersen patent is incorrect.

(b) When a complete molecular formula cannot be stated, the Patent Office seems to accept a clear description of how the material is made. Andersen specified in his patent that the aluminum chlorohydrate which he used was made according to the Huehn patent U. S. 2,-392,531, that is, by the electrolysis of aluminum salt solutions. However, the evidence discloses that the aluminum chlorohydrate purchased from Reheis was made by the totally different method of reacting aluminum metal with an aluminum salt, Huehn patent U. S. 2,-196,016 (Record, 254); and it is clear from the evidence that Reheis never made Chlorhydrol by the electrolysis method (Record, 364). This evidence is corroborated by Defendant's Exhibit 8, a license from the Alien Property Custodian to use Huehn patent U. S. 2,196,-016 rather than the later electrolytic patent.

The plaintiff takes the position that a soluble basic aluminum chloride made by either of these patents is essentially the same, but there is no evidence in the record to support this view. Merely because the ratio of Al:Cl can be made 2:1 in each case does not indicate that the materials would behave identically. If this argument were sound, it would also be necessary to accept the contention that a basic aluminum chloride made by still a third method, for example, that described in the testimony of Beekman (Record, 366, 781) or one of those in Mellor, Treatise on Inorganic Chemistry, Volume 5, pages 277–278 (1924), (Defendant's Exhibit 6, Item 16), also has essentially the same properties. In this event, there would have been no basis for the issuance of the patent, since a presumably equivalent basic aluminum chloride was known many years before the patent application.

It is clear, therefore, that Andersen did not in his patent describe the material he used, and this being the case, the patent is invalid. Moreover, even if it had been correctly described, i. e., even if the electrolytically prepared material had been used, it must be assumed a priori that the material of Reheis, prepared by some other procedure, is different in molecular state. Thus, even if the patent were valid, infringement could not be assumed unless it was demonstrated that identical materials were obtained by both methods of preparation.

2. *Who first found that aluminum chlorohydrate is an effective antiperspirant?*

The answer to this question depends on the answer to the more basic question: At what point can it be concluded that a particular composition of matter is an effective antiperspirant? The evidence (Snell, Record, 174) indicates that such a conclusion is warranted when at least the following requirements have been satisfied:

(a) The material does not harm fabrics.

(b) The material does not irritate the skin of a living human being.

(c) The material actually stops or decreases markedly the perspiration of a human being.

Tests of the first two requirements can be carried out by scientific procedures. Fabric deterioration tests have been standardized. Irritancy questions can be solved by accepted skin patch tests. Both of these tests were initiated by Reheis without any suggestion or contribution from Andersen (Record, 696, 725). The record demonstrates that the first test (Defendant's Exhibits 9, 12A, 12B, 12C, 13, 14) was completed at least one year before Andersen even

knew of Chlorhydrol. In any event, Andersen concedes (Record, 696) that he obtained the data on fabric deterioration used in his patent from Reheis.

We are warranted in concluding from this concession by Andersen that he also concedes that the idea that aluminum chlorohydrate could be an antiperspirant occurred first to Reheis, and that Reheis was the first to carry out the necessary experiments with some form of aluminum chlorohydrate, albeit perhaps not with a cream. The evidence is clear that the idea occurred to Reheis (or someone in his organization) long before Andersen even heard of the material. The Defendant's Exhibit 15, especially the letter of April 18, 1946, is a complete disclosure of the essential information on aluminum chlorohydrate as a potential antiperspirant. A similar letter was admittedly read by Andersen before he started his work. (Record, 729–730). The Defendant's Exhibit 48, dated February 11, 1946, mentions tests on human beings, as well as the other requirements, for antiperspirant activity.

It appears from a careful reading of the entire record that nobody actually carried out a detailed test to determine whether the material actually stopped or decreased markedly the perspiration of a human being (Requirement (c) above). It appears that more simple alternatives were attempted, such as the protein precipitation test (Defendant's Exhibit 43) or the frog skin test (Plaintiff's Exhibit 20). The defendant's protein precipitation test was completed before the plaintiff's frog skin test. Even with the frog skin test, the defendant's samples seem to have been submitted earlier (June 12, 1946) than that of Andersen (probably June 15, 1946. Cf. Plaintiff's Exhibit 26). Neither party can successfully maintain that either of these tests is a quantitative measure of actual antiperspirant activity in human beings. (Record, 493 (Neville); 629 (Oser)). Each of these tests measures one of the properties (blocking of pores, contraction of skin) which contribute to actual antiperspirant activity.

The plaintiff contends that she was the first to market a product which was accepted by the public, but it appears from the record that Reheis worked out completely Requirements (a) and (b) above for the antiperspiration potentialities of aluminum chlorohydrate and carried out one very promising test, protein precipitation. Even the last test (Defendant's Exhibit 43, December 17, 1945) was made long before Andersen had even heard of aluminum chlorohydrate. Some time later Andersen had the frog skin tests carried out by Oser, and then, using all the other data collected by Reheis, he applied for a patent. The Patent Office was not made acquainted by Andersen with the source of his information on the properties of aluminum chlorohydrate, but was allowed to assume that all the new data were Andersen's. (File Wrapper, Plaintiff's Exhibit 32). Andersen (or Arden) also put out a commercial product before Reheis.

As was pointed out above, Defendant's Exhibit 48, dated February 11, 1946, referred to tests on human beings, as well as the other requirements for antiperspirant activity, but even if this exhibit is not conclusive on the point, the essential difference between Reheis and Andersen is that Reheis did virtually all of the work necessary to demonstrate the antiperspirant potentialities of aluminum chlorohydrate but did not put it on the market; whereas Andersen participated in only one phase of the preliminary testing, used Reheis' data on the other factors and marketed the material. To hold that Andersen should prevail in these circumstances would be to cheat out of his invention an inventor who carried his work essentially to completion but had no commercial outlet to test public acceptance.

The plaintiff asserts that Andersen used aluminum chlorohydrate with an emulsifier. There is no doubt, however, that the test made by Reheis was on some form of soluble aluminum chlorohydrate, even if not on a cream. The file wrapper (Plaintiff's Exhibit 32) re-

veals that the Patent Office did not consider the process of preparing aluminum chlorohydrate in an emulsion form as an invention as such but insisted that aluminum chlorohydrate be specified as a constituent. There is ample support for this view in the opinion of the United States Supreme Court in the case of Mandel Brothers, Inc., v. Wallace, 1948, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12. In view of the language of Mr. Justice Black in that case, it cannot successfully be maintained that the combination of aluminum chlorohydrate with an emulsifier is an invention, once it was known that aluminum chlorohydrate as such had antiperspirant properties.

Aside perhaps from public acceptance Andersen did not anticipate Reheis in any particular. In addition to the fabric and patch tests which Andersen admits he obtained from Reheis, there is reason to believe that the pH values listed in the patent were also secured from information supplied by Reheis. (Record, 301; Defendant's Exhibits 18 and 19). It is unlikely that Andersen using a Beekman pH meter (Record, 654) would have obtained identical readings as the Reheis group using a Coleman pH meter (Defendant's Exhibit 6—American Perfumer article) on each of four different solutions. It is also pertinent to note that Andersen's letter to Haslam (Plaintiff's Exhibit 38), dated July 2, 1946, lists a pH for aluminum chlorohydrate different from that given in the patent. In this letter, furthermore, Andersen again admits that the fabric and skin tests came from Reheis.

Even in connection with public distribution, there is evidence that others anticipated Arden. It appears that the Puritan Co. used aluminum chlorohydrate in batch manufacture (Deposition of John Ayars, page 6; Record, 805) at least by June 3, 1946, and that this was sold to Marian Bialac, a commercial distributor (Ayars deposition, pages 11, 13). It is true that the use was in solution without an emulsifier but since the Court is of the opinion that the addition of an emulsifier did not constitute an invention, the evidence is of some importance. There is also evidence that aluminum chlorohydrate was used by the defendant as an ingredient for an antiperspirant as early as the middle of 1945 (Plaintiff's Exhibit 8, page 4).

3. (A) Is the use of aluminum chlorohydrate as an antiperspirant an invention in view of the prior art?

(B) Is the combination of aluminum chlorohydrate with an emulsifier an invention?

A reading of the file wrapper (Plaintiff's Exhibit 32) shows that the Patent Office insisted that Andersen define clearly the material, aluminum chlorohydrate, in the composition he was attempting to patent. Every claim allowed in the patent mentions the aluminum chlorohydrate so defined. It seems clear, therefore, that the Patent Office would not have considered the combination of an undefined basic aluminum chloride with an emulsifier as patentable. Rather it was the use of this particular aluminum chlorohydrate form of basic aluminum chloride in a composition, which incidentally contained also an emulsifier, useful as an astringent, that was granted a patent.

In Mandel Brothers, Inc., v. Wallace, supra, the patent involved provided for the combination of urea, a known acid neutralizer, with an ordinary acid aluminum salt, the combination to be used as an antiperspirant. The United States Supreme Court held that the use of this agent was merely the application of an old process to a new use and was not invention. Relying on this authority, the Court is of the opinion that the combination of aluminum chlorohydrate with an emulsifier is not invention. This combination requires even less imagination or "flash of genius" than that involved in Mandel Brothers. The major problem with older antiperspirants was to overcome acidity, not to prepare an emulsion or a cream, and the Court in Mandel Brothers held that a known method of overcoming acidity combined for the first time with an acid aluminum salt was not invention. It seems to this Court that

putting aluminum chlorohydrate into a cream or emulsion is even less an invention. If Andersen's cream was made up of either an unusual component or extraordinary proportions of known components, then a case for invention of the composition (but not the active ingredient) might perhaps have been made. However, the final cream contained ingredients and proportions in line with earlier formulas and therefore required no special imagination or invention.

The Court is of the opinion that the Patent Office would not have granted a patent to Andersen if it had had knowledge of the facts as disclosed by the evidence in this suit. The Court holds the patent in suit invalid.

Counsel for the defendant are directed to prepare findings of fact, conclusions of law and a decree consistent with the views herein expressed, and to submit the same on or before September 27, 1954.