LAMINEX, INC., Plaintiff and Counter-Defendant,

v.

Ronald C. FRITZ and Identatronics, Inc., Defendants and Counter-Plaintiffs.

No. 73 C 1554.

United States District Court,
N. D. Illinois, E. D.

Aug. 13, 1974.

Philip H. Mayer, Wolfe, Hubbard, Leydig, Voit & Osann, Chicago, Ill., Dalbert U. Shefte, Richards, Shefte & Pinckney, Charlotte, N. C., Fritz L. Schweitzer, Mandeville & Schweitzer, New York City, for plaintiffs.

Thomas E. Dorn, Kinzer & Dorn, Chicago, Ill., for defendants.

## MEMORANDUM OF DECISION

JULIUS J. HOFFMAN, Senior District Judge.

This is presently an action for patent infringement in which the defendants counterclaim for declaratory judgments of noninfringement, patent invalidity and unenforceability.

Previously the suit was more complex: plaintiff asserted claims of trademark

infringement, unfair competition and deceptive trade practices; defendants counterclaimed for alleged violations of the antitrust laws. These issues, however, have been resolved.[1]

By way of assignment, Laminex, Inc. is the owner of all right, title, and interest in and to the two patents in suit. United States Letters Patent No. 3,417,497, issuing December 24, 1968 on an application of Donald F. Hannon, is directed to a laminated plastic identification card. United States Letters Patent No. 3,413,171, issuing November 26, 1968, likewise on an application of Donald F. Hannon, is directed to a process of manufacturing that card.

The Court has jurisdiction over the parties and over the subject matter of both the complaint and counterclaim. 28 U.S.C. §§ 1338(a), 2201. Venue is properly laid in this district. 28 U.S.C. §§ 1391(c), 1400(b).

Plaintiff accuses the defendants of direct, contributory, and inducement of infringement of claims of both the Hannon '171 and '497 patents. These charges are based upon defendants' "manufacture and sale of identification cards to Arnold Engineering Co. of Marengo, Illinois, and the solicitation and acceptance of orders for identification cards from Rich Township High Schools, Richton Park, Illinois and Kankakee School District of Kankakee, Illinois."[2] Although the defendants admit having sold identification card materials to Arnold Engineering Co. and having sold identification cards to the Rich Township High Schools and the Kankakee School District, they deny that any of their acts, including "the sale and the assembly of identification cards and the sale of materials for identification cards" have infringed claims of either the '171 or the '497 patent.[3]

## INFRINGEMENT

■ Patent infringement is a fact issue on which the plaintiff has the burden of proof by a preponderance of the evidence. Becker v. Webcor, Inc., 289 F.2d 357, 360 (7th Cir. 1961), cert. denied, 368 U.S. 970, 82 S.Ct. 445, 7 L.Ed. 2d 398 (1962); Gyromat Corp. v. H. G. Fischer & Co., 167 USPQ 326, 342 (N.D. Ill.1970).

The plaintiff manufactures and sells both completed identification cards and partially assembled card packs for which final lamination is effected by the customer under notice of the Hannon '171 and '497 patents. Plaintiff's patent notice is also used on its PIP core material, but is not used on its overlaminate film when the overlaminate is sold separately. The plaintiff sells three different core materials. Each possesses a central sheet of vinyl plastic that is covered on each side with a layer of thermoplastic bonding resin, the resins being either polyethylene with melt index of 3.7, polyethylene with melt index of 7.0, or acrylic acid copolymer of polyethylene with melt index of 3.5. The plaintiff also sells three different overlaminate materials, each having a layer of polyester material coated on one surface with one of the three bonding resins just identified. Plaintiff does not segregate its card materials by melt index, but sells the core-overlaminate materials in any of the following melt index combinations:

| | | |
|---|---|---|
| 3.7–3.7 | 3.5–3.5 | 3.7–3.5 |
| 3.7–7.0 | 7.0–7.0 | 3.5–7.0 |

All of these combinations afford essentially equal bonding characteristics and are essentially equal in their tamper-resistant qualities as finished identification cards.

---

1. During trial, the parties decided to settle the issues raised by the Second and Third "Causes of Action" of the Complaint and Count 2 of the Amended Counterclaim. On December 17, 1973, the Court, in accordance with their wishes and pursuant to Fed.R.

Civ.P. 54(b), directed entry of final judgment with respect to all these matters.

2. Par. 11, "First Cause of Action," Complaint.

3. Pars. 10, 11, Amended Answer.

The identification card core sheet sold by the defendants is composed of a central layer of white pigmented polyester resin coated on both surfaces with a bonding layer consisting of a blend of approximately 67.8% polyethylene, 22.6% copolymer of ethylene and acrylic acid, and 9.6% titanium dioxide white pigment. Before addition of the titanium dioxide pigment, the blend consists of 75% polyethylene and 25% ethylene copolymer and has a melt index of approximately 9.9. Addition of the pigment lowers the melt index. The bonding layer of the defendants' core material is heat-softenable thermoplastic containing less than 3% acrylic acid. The defendants also sold an overlaminate material composed of an outer layer of clear polyester coated with a blend of 75% polyethylene and 25% copolymer of ethylene and acrylic acid, the acrylic acid content being less than 3%. Additionally, defendants sold a completed laminated plastic identification card, made from the materials just described. Roll (rotary) lamination was utilized in the final step of fabrication of that card. The defendants also sold card packs, made from these same materials. These card packs were laminated by the customer, usually by a roll lamination procedure. In some of the defendants' completed cards as in some of their card packs, there was no individual identifying indicia or photo.

*Hannon '171 Patent*

■ Direct infringement of a method or process patent requires, at least, that the infringer have performed the principal steps of the process claims. See Plastering Development Center v. Perma Glas-Mesh Corp., 371 F.Supp. 939, 949 (N.D.Ohio 1973); Engelhard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347, 351 (9th Cir. 1963), cert. denied, 377 U.S. 923, 84 S.Ct. 1220, 12 L. Ed.2d 215 (1964).

Step (a) of each independent claim of the Hannon '171 patent is directed to "forming a core." In Claims 1 and 7, this step is recited as:

"(a) forming a core including a heat-softenable plastic material defining at least one bonding surface,"

whereas in Claim 5, the same step is recited as:

"(a) forming a core having a core sheet coated on both faces with a heat-softenable plastic bonding material."

Here, defendants did not perform step (a), in either form, but merely purchased core material developed independently by others. Furthermore, since Claims 2–4 are dependent upon Claim 1, and Claim 6 is dependent upon Claim 5, the same conclusion must be reached as to these claims.

Step (b) of Claim 1, Hannon '171, requires provision for protective coverings, each comprising an outer protective layer and a bonding layer of thermoplastic material "having the same melt index" as the bonding layer on the core. In a similar fashion, step (c) of Claim 5 requires the application of outer overlaminate sheets composed of layers of thermoplastic material "having substantially the same melt index" as the bonding material on the core. The bonding layer melt index of the protective overlaminate sheets used by the defendants, on the other hand, is different from that of the bonding layers on the core, since, as discussed earlier, the melt index of the core bonding layers is lowered by the presence of pigment. There was no evidence that the melt index of the complete core bonding layers used by the defendants was the same or substantially the same as that of the bonding layers of the overlaminate sheets they used. This differentiation applies equally to Claims 2–4 and 6, 2–4 being dependent upon Claim 1, 6 upon Claim 5.

All claims of the Hannon '171 patent are limited to a construction in which the core is covered by "a protective envelope," this expression being a part of

each of the independent claims, 1, 5, and 7. Each of the accused products of the defendants, however, includes a core sheet that is coextensive in area with the covering overlaminate sheets. Hence, the edges of the core sheets in the defendants' products are exposed, and thus, no "protective envelope" is formed.

Contrary to the requirements in Claim 2 of Hannon '171, the defendants have never used a protective covering in which "grid work" was printed on at least one of the bonding surfaces. There was also no showing that the clear polyester used by the defendants in their overlaminate materials was the "polyethylene glycol ester of terephthalic acid," as expressly required by step (c) of Claim 5, Hannon '171. Finally, as established by the stipulated evidence on the composition of the overlaminate bonding layers used by the defendants, those bonding layers are not the specified copolymer of polyethylene and acrylic acid, and have an acrylic acid content of less than the 3% required by step (b), Claim 7, of Hannon '171.

■ Direct infringement, therefore has clearly not been established.

■ The fundamental basis of the patent law requires that a patent holder establish acts of direct infringement before liability for inducement or contributory infringement can be found. See Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961), and Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). In any event, the record here is utterly devoid of evidence that could be used to establish inducement of or contributory infringement. The evidence of record does not indicate that the defendants induced any party to perform the step of "forming a core," a principal step in each and every claim of the Hannon '171 patent. Rather, the evidence indicates that the defendants merely purchased core materials, independently developed by others, which materials utilized standard "off-the-shelf" heat-seal coatings employed in the packaging industry for a variety of end uses. An arms-length purchase of this nature does not constitute inducement of infringement. Amtron Inc. v. Nordson Corp., 180 USPQ 27, 29 (N.D.Ill.1973). The rotary laminators used to laminate identification cards under the process of the Hannon '171 patent are also suitable for laminating products other than identification cards and for laminating identification cards quite unlike those made under the patents in suit. To establish contributory infringement under the circumstances of this case, there must be convincing evidence of both knowledge of manufacture for a special purpose and the absene of substantial non-infringing uses. 35 U.S.C. § 271(c). On this record, the plaintiff fails to establish contributory infringement.

*Hannon '497 Patent*

■ Even if the same result is achieved by the accused device, a product patent is infringed only if that device contains all the elements of the claims it is alleged to infringe. Minnesota Mining & Mfg. Co. v. Permacel-LePage's, Inc., 334 F.2d 820, 823 (7th Cir. 1964); Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 243 F.2d 136, 140 (4th Cir. 1957); also, see All States Plastic Mfg. Co., Inc. v. Weckesser Co., Inc., 362 F.Supp. 94, 99–100 (N.D.Ill.1973).

■ Each of the independent claims of the Hannon '497 patent includes a specific recital of an outer "protective envelope" of laminated construction. This limitation appears in clause (b) in Claims 1 and 9, in clause (c) in Claims 5 and 14, and in the initial paragraph in Claim 11. The accused products of the defendants, however, utilize core sheets that are coextensive in area with the overlaminate sheets, so that the edges of the defendants' core

sheet are exposed and no envelope is formed. The same limitation applies to each of the dependent claims in the Hannon '497 patent. Thus, the accused device does not contain the "protective envelope" of the claims it is alleged to infringe. Furthermore, there was no evidence to indicate or demonstrate that a flush-edge card, such as the defendants', is equivalent to a card having a complete protective envelope, as set forth in the Hannon '497 patent. One could readily surmise that a flush-edge construction would not be suitable for the paper core card described in Hannon '497. The exposed edges of the paper core could absorb moisture, leading to the rapid deterioration of the card. Such exposed edges would also allow for the splitting of the card, facilitating mechanical damage to it. Thus, although a complete envelope would be needed for the Hannon '497 card, it is neither needed nor used in the defendants' all-plastic card. Finally, it is significant to note that the original application on which the Hannon '497 patent is based, Serial No. 373,664, included a product claim that did not employ the limited "protective envelope" terminology used in all of the patented claims. Thus, original Claim 13 in the first Hannon application called merely for "an outer protective covering," without requiring that that covering constitute an "envelope." Original Claim 13 was cancelled in the face of a prior art rejection, and no claim of comparable scope was ever reasserted. Accordingly, the plaintiff is estopped to assert claims of comparable scope, under the many decisions on "file-wrapper estoppel." Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The "envelope" limitation cannot be ignored, and is not equivalent to the exposed-edge construction used by the defendants.

Independent Claims 1, 5, and 14 of the Hannon '497 patent each expressly require the use of an envelope material presenting an exterior surface shell formed of "polyethylene glycol ester of terephthalic acid"; this limitation appears in clause (b) of Claim 1, clause (c) of Claim 5, and clause (c) of Claim 14. The accused products of the defendants incorporate a clear polyester layer for the overlaminate, but no evidence has been presented to indicate that this polyester is the polyethylene glycol ester of terephthalic acid or even an equivalent thereof. Since the plaintiff is entitled to no presumption of equivalence, see Graham v. Jules Montenier, Inc., 123 F.Supp. 634, 636 (N.D.Ill.1954), without proof, it cannot successfully maintain the position that the polyester used by defendants is equivalent to the "Mylar" ester specified in Claims 1–8 and 14 of the Hannon '497 patent. The same express limitation applies to Claims 2–4, which are dependent upon Claim 1, and to Claims 6–8, which are dependent upon Claim 5.

Independent Claims 1 and 9 of Hannon '497 each require, in clause (d), that the bonding material of the overlaminate (envelope) be formed of materials "having substantially identical melt indexes." This limitation also applies to Claims 2–4, which are dependent upon Claim 1, and to Claim 10, which is dependent upon Claim 9. The melt indexes of the bonding layers of the defendants' core and overlaminate material, however, are not the same, even though there is no evidence of record to indicate the precise melt index of defendants' core bonding layer. This bonding layer contains a significant quantity of pigment, not present in the bonding layer of defendants' overlaminate, and this pigment, as discussed earlier, lowers the melt index.

Clause (d) of Claim 5 of the Hannon '497 patent requires that the polyethylene layer on the core and the polyethlene layer on the overlaminate (envelope) material be "of substantially identical chemical composition, and physical properties." Because of a fact to which the Court has just alluded, that the core bonding layers on the defendants' core material include 9.6% titanium dioxide pigment that is not present in the bond-

ing layers of the overlaminate, the substantial identity of chemical composition required by this claim clearly does not exist in the accused devices. Further, there is no evidence of record to show that these layers in the defendants' products have substantially identical or even equivalent physical properties. One important physical property in which they are obviously different is that of opacity, which is due to the presence of pigment in the core bonding layer not present in the overlaminate bonding layer. These conditions apply equally to Claims 6, 7, and 8, which are dependent upon Claim 5.

· Each and every claim of the Hannon '497 patent expressly requires the application of "identifying indicia" to one of the bonding surfaces of either the core or the overlaminate. From the patent specification, it is clear that this "identifying indicia" recital constitutes the individual, variable information which might be subject to tampering, as contrasted with the overall company or group identification for which no tampering would be anticipated. In at least some of the defendants' accused products, there are no individual "identifying indicia" as specified in the claims of the Hannon '497 patent. Rather, these cards carry only general group data.

There is no evidence to indicate that the melt index of the core bonding layer on the core material of the defendants is "about 5" as specified in Claim 3 of the Hannon '497 patent.

Claims 4, 8, 13, and 14 of the Hannon '497 patent each specifically require the use of a bonding material constituting "a polyethylene copolymer composed of polyethylene and 3% to 10% by weight acrylic acid." The bonding layers used by the defendants do not meet this requirement. Instead, the defendants use bonding layers which comprise a blend of polyethylene with a copolymer of ethylene (not polyethylene) and acrylic acid, in which the acrylic acid content is less than 3%.

The stipulated evidence regarding the defendants' accused products reveals that none of those products includes the "paper core sheet" specified in clause (a) of Claim 5 of Hannon '497. On the contrary, the defendants use an all-plastic construction.

Finally, there is no evidence to indicate that the defendants have ever made, used, or sold an identification card employing a grid superposed over a photograph as specified in Claims 6 and 7 of the Hannon '497 patent.

Thus, the device accused clearly does not contain "all the elements" of the claims it is alleged to have infringed. In simple fact, the accused products of the defendants are clearly and explicitly different from the product disclosed in the claims of the Hannon '497 patent. The claims of Hannon '497 have not been infringed.

*Range of Equivalents*

■ The plaintiff suggests that the many features which might be cited as distinguishing the processes and products of defendants from the claims of the Hannon '171 and '497 patents should be discounted for the reason that defendants have utilized elements which are structurally and procedurally equivalent to the elements set forth in the patent claims. There was, however, little or no evidence of equivalence, either by way of testimony or documentation, and hence, there is an inadequate factual foundation upon which to invoke the doctrine.

■ Even so, as will appear from the discussion on validity, the Hannon '171 and '497 patents are not entitled to any substantial range of equivalents because they constitute no more than minor modifications in a crowded, well-developed art. In fact, their claims must be restricted to a very narrow range of equivalents. Fife Manufacturing Company v. Stanford Engineering Co., 299 F.2d 223, 226 (7th Cir. 1962); Wen Products Inc. v. Portable Electric Tools,

Inc., 367 F.2d 764, 766, 767 (7th Cir. 1966); Lorenz v. Berkline Corporation, 215 F.Supp. 869 (N.D.Ill.1963). Accordingly, the many differences between the patent claims and the accused processes and products of the defendants would have to be given effect.

## VALIDITY

### Obviousness

The evidence presented has established the following:

(1) Except for the feature of suspension of identifying indicia in fused bonding material, the 1961 Hannon patents, No. 2,984,030 and Re. 25,005, and their commercial embodiments, anticipate every principal step and element of the patents in suit;

(2) Although the Patent Examiner did not find prior art showing identifying indicia suspended between fused layers of thermoplastic bonding material, such a construction was present;

(3) The Hannon '171 and '497 patents constitute no more than an obvious aggregation of the prior art.

(1) The close structural relationship between the basic identification card structure described and illustrated in the 1961 Hannon patents No. 2,984,030 and Re. 25,005 and the identification card construction that is fundamental to both the Hannon '171 and '497 patents is set forth in the "Background of the Invention" portions of the specifications of each of the Hannon '171 and '497 patents. The Hannon '171 patent describes the earlier Hannon Re. 25,005 in the following terms:

"The preferred card disclosed in the reissue patent consists of a central paper core upon which a photograph is mounted and identifying indicia is [sic.] printed. The paper core is sandwiched between two layers of a plastic material sold commercially under the trademark "Mylar" which layers are bonded to the core by laminae of polyethylene."

The same description is contained in the Hannon '497 patent.

The specifications of the Hannon '171 and '497 patents also make it apparent that the "improvement" over the earlier Hannon patents constitutes only the provision for a coating of thermoplastic resin bonding material on the core sheet, affording a construction in which the individual identifying printed indicia (and a photo if present) are suspended in the thermoplastic bonding material.

Both the Hannon '171 and '497 patents mention the desirability of using roll (rotary) lamination to facilitate the successful fabrication of cards having indicia suspended in thermosplastic bonding material. However, roll laminators for manufacturing identification cards using the same Mylar-polyethylene overlaminate as in the Hannon '171 and '497 patents were already known in the art from Lapham Patent No. 3,163,104 and others. Roll laminators of this kind were used to make an identification card corresponding with the structures described in the Hannon 2,984,030 and Re. 25,005 patents.

The testimony of the inventor, Donald F. Hannon, is most illustrative of the fact that the only significant difference between the commercial process of manufacture of the cards shown in the prior art Hannon Re. 25,005 and No. 2,984,030 patents and the process of the Hannon '171 patent in suit is the application of thermoplastic material (polyethylene) to the surface of the core so that identifying indicia subsequently applied to that surface end up suspended between two fused thermoplastic layers. In the words of the inventor:

"The reason the patent ['171] . . . is a better product, is that it has a—the printing or the variable information is floating between two lay-

ers of polyethylene and once it is sealed, it is practically impossible to separate either chemically or mechanically or by reheating the card."

The same conclusion is suggested from the prosecution history of the applications that resulted in issue of the Hannon '171 patent. In the original application, the response to the Patent Office, after the first Official Action, contained the following language:

"The use of roll lamination with the combination of materials presented here . . . provides a novel method of making an identification card with the printing, in effect, floating in the bonding material but not distorted by the lamination operation. The results are [sic] a card with sharp and clear printing. There is indeed a discovery here in that one can bond together two layers of heat-softenable material with printing on one or both of them without affecting, in any noticeable amount, the clarity and the detail of the printed matter."

However, roll lamination was already known and commercially used for the final lamination step in the manufacture of the prior art cards of the Hannon Re. 25,005 and 2,984,030 patents. In fact, roll lamination had been used commercially for that purpose since as early as 1960. Moreover, in at least the card of Hannon 2,984,030, a printed grid was applied to the polyethylene coating on the overlaminate and passed through the lamination step without distortion.

The statement concerning the sole significant difference between the prior art Hannon patents and the ·Hannon '171 patent also applies to the Hannon '497 patent, the inventor having noted that the card structures of the two are identical. Furthermore, during prosecution of the Hannon '497 patent, when faced with a rejection based upon Van Clief patent No. 1,349,396 (showing a label structure with luminous paint positioned between two layers of celluloid), the patentee argued:

"There is no remote suggestion of the concept that printed indicia may be at an interface of two plastic materials so as to obviate any possibility of alteration or tampering with the security of an identification card. It is not seen wherein the suggestion of protecting paint from fading can possibly suggest the concept of preventing tampering with an ID card. This is especially so when one appreciates the problems of preventing blurring of the ink imprinted on the polyethylene."

(2) The prior art contains several instances of identification card structures in which,

" . . . in the finished card, all printed indicia and the photograph are disposed between two layers of thermoplastic bonding material which have been heat bonded together so that the identifying indicia are encased ·within the bonding material." (Statement contained in the "Official Letters Patent Document" for both the Hannon '171 and '497 patents.)

One early example of this construction is Whitehead patent No. 2,780,015 (1957), disclosing a laminated tamper-protected identification card with a paper core bearing both printed identification information and a signature. The core is covered on both sides with sheets of clear thermoplastic material. The card is laminated into one unit under heat and pressure. Whitehead patent No. 2,780,015 states:

"In order to discourage or prevent mechanical removal of the thermoplastic sheets from the paper backing, the paper backing is preferably impregnated with a thermoplastic material so as to bond the paper backing to the cover sheets when the heat and pressure of lamination are applied to the backing and cover sheets to render these components homogenous."

In making the card of Whitehead patent No. 2,780,015, polyethylene could be used as the thermoplastic material for both impregnation of the core and for formation of the cover sheets. The printed indicia and the photo of Whitehead 2,780,015 are encased or suspended within fused thermoplastic, just as in the Hannon '171 and '497 patents.

Another prior art identification card in which identifying indicia are "suspended" within thermoplastic bonding material is Whitehead patent No. 2,835,993 (1958). This card includes a thermoplastic core formed from two thermoplastic sheets. Two intermediate thermoplastic sheets overlie the core and have printed indicia facing inwardly. The card also contains two thermoplastic covers that have colored thermoplastic threads facing inwardly toward the intermediate sheets. This all-plastic card construction is laminated under heat and pressure to afford a construction in which a photo, the printed indicia, and the thermoplastic threads are all "suspended" in fused thermoplastic material. The Whitehead patent No. 2,835,993 does not provide a protective envelope; instead, it incorporates a flush-edge construction like that used by the defendants.

A further example of a prior art identification card having printed indicia and a photograph encased within fused thermoplastic bonding material is Biddle patent No. 3,068,140 (1962). In the Biddle patent, printed and typewritten indicia are inscribed upon the surface of a thermoplastic sheet that has been folded over to form a core. A photograph may be mounted in an aperture in one side of the core. Two transparent thermoplastic sheets are disposed on the opposite sides of the core. The entire "sandwich" is then fused together under heat and pressure, after which the fused assembly is trimmed to the desired size.

The construction of Biddle patent No. 3,068,140 was manufactured and sold commercially by Addressograph. The suspension of identifying indicia in fused plastic is the same in the Biddle-Addressograph card as it is in the card structure of the Hannon '171 and '497 patents. Furthermore, the trimming operation employed in the Biddle construction produces a flush-edge card corresponding to that used by the defendants, rather than a card envelope of the kind described and claimed in the Hannon '171 and '497 patents.

 (3) For a patent to be valid, the differences between its subject matter and the prior art must be such that, as a whole, at the time of the invention, the patented subject matter would have been unobvious to a person of ordinary skill in the art. 35 U.S.C. § 103. Where a number of prior art references suggest doing what the patentee has done, the patent is invalid for obviousness, and the references may be considered in combination in reaching such a conclusion. Armour Research Foundation v. C. K. Williams & Co., 170 F.Supp. 871, 885 (E.D.Ill.1959), aff'd 280 F.2d 499 (7th Cir. 1960), cert. denied, 365 U.S. 811, 81 S.Ct. 690, 5 L.Ed. 2d 691 (1961), reh. denied, 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852 (1961); Gyromat Corp. v. H. G. Fischer & Co., 167 USPQ 326, 336 (N.D.Ill.1970).

The two Whitehead patents are directly concerned with tamper protection for laminated plastic-covered identification cards. Each affords a construction in which identifying indicia end up "suspended" between two fused layers of thermoplastic material. The same result is achieved with equal effect in the Biddle-Addressograph card. Thus, the prior art expressly and directly indicated that a tamper-protected identification card should have its printed identifying indicia located between two thermoplastic layers fused on final lamination of the card so that the indicia are encased in the plastic. This "suspended indicia" feature is the only significant change in

the Hannon '171 and '497 patents relative to the earlier Hannon No. 2,984,030 and Re. 25,005 patents. Moreover, bringing together the old steps and elements was clearly suggested, by the art, for the very purpose indicated by the patentee.

The process described and claimed in the Biddle patent includes each and every basic step set forth in the claims of the Hannon '171 patent, with only minor differences in structural detail, and a single process differentiation, the roll lamination technique used since 1960. This is most directly apparent from a comparison of Claim 1 of the Hannon '171 patent and Claim 3 of the Biddle patent:

Hannon '171
Claim 1

"The process of forming an identification card comprising the steps of:

(a) forming a core including a heat-softenable plastic material defining at least one bonding surface;

(b) providing first and second outer protective coverings, each comprising an outer protective layer and a bonding layer of a heat-softenable plastic material having the same melt index as said core plastic material and each bonding layer having a bonding surface;

(c) applying indicia to at least one of the bonding surfaces at least some of said indicia being provided by printing with ink; and,

(d) laminating the coverings to the core to provide a protective envelope by heating and compressing the coverings and the core therebetween by roll lamination and thereby adhering said protective covering bonding surfaces to said core."

Biddle 3,068,140
Claim 3

"The method of assembling an identification device comprising the following steps:

cutting said sheet into a plurality of corresponding identification device segments each comprising an obverse-side portion and a corresponding portion bearing reverse-side data; folding each of said identification device segments to dispose the obverse and reverse side portions thereof in back-to-back relation;

disposing sheets of substantially transparent thermoplastic over the exposed opposite sides of each of said segments;

imprinting one side only of a thin opaque base sheet of thermoplastic with general identification data for the obverve and reverse sides of a plurality of identification devices, the data for the obverse and reverse sides of each device being disposed in paired juxtaposed relation to each other;

and fusing the transparent thermoplastic sheets and the two portions of each of said segments together under heat and pressure to form a plurality of protected unitary identification devices indivisible along the planes of fusion."

Of course, the foregoing comparison includes a change in sequence for the steps of the Biddle patent claim; however, the Hannon '171 patent claim does not require that the steps be performed in sequence. Furthermore, the sequence is not critical; certainly, in following Claim 1 of the Hannon '171 patent, the core can be printed, step (c), before "providing" the protective coverings, step (b).

Nor do the differences in materials appearing in the later claims of the Hannon '171 patent distinguish its process claims from those of the Biddle patent. As stated by the court in Chenault v. Nebraska Farm Products, 138 F.Supp. 772 (D.Neb.1956):

"The steps comprising the process are the essential features for consideration in determining the validity of a process patent over a prior patent, not the particular material to which the process is applied nor the particular substance obtained by its application." 138 F.Supp. at 784.

Roll lamination, "old" in the art since 1960, is the only part of a process "step" distinguishing the Hannon '171 patent claims from the Biddle patent, and it constitutes an obvious modification based on the materials selected by Hannon.

Finally, the single component change expressly described in the Hannon '171 and '497 patents, as compared with the earlier Hannon No. 2,984,030 and Re. 25,005 patents, is the use of polyethylene-coated paper as the core. But polyethylene was well known as a paper coating as was disclosed in that portion of The Condensed Chemical Dictionary (6th Ed. 1961) definition of the term not cited to the Patent Examiner.

■ Thus, in the context of the prior art, Hannon '171 and '497 constitute a mere adaptation of the construction of the prior Hannon patents No. 2,984,030 and Re. 25,005 to a construction in which identifying indicia are suspended between two fused thermoplastic layers, a construction well known in the art as exemplified by the Whitehead patents and the Biddle-Addressograph card. Nor, does the use of roll lamination save the validity of the Hannon '171 patent, because this was the normal technique of manufacture then being used commercially in the art and had been applied to cards having a grid printed on the polyethylene of the overlaminate. Roll lamination is irrelevant and immaterial to the scope of the Hannon '497 patent. The claims of Hannon '497 do not mention roll lamination; they apply equally to platen-laminated cards such as the Addressograph card. Accordingly, in view of the acknowledged prior art, Hannon '171 and '497 are "obvious," and consequently, both are invalid under the terms of 35 U.S.C. § 103.

*Anticipation*

■ To be novel, an invention must not have been anticipated by a prior patent. 1 Deller's Walker on Patents § 58 (2d ed. 1964).

The Rudershausen et al. No. 3,279,826 (1966), applied for May 27, 1964, discloses an identification card composed of a central core sheet coated on both sides with a layer of thermoplastic, preferably polyethylene, with identification data printed on the outer surface of the thermoplastic coating. This core is sealed into an envelope formed of Mylar-polyethylene overlaminate, the final assembly being accomplished by conventional methods which would include roll lamination. The basic card construction of this patent is identical to that of the Hannon '171 and '479 patents.

In the prosecution of the Hannon '171 patent, all of the process claims in the continuation-in-part application were rejected as being obvious over a combination of references including the Rudershausen et al. patent, the latter being

cited for the purpose of showing "two polyethylene bonding layers with printing sealed between." The Patent Examiner apparently was unaware that the assignees of the Rudershausen et al. patent and the Hannon '171 patent were both commercially using roll lamination, and therefore cited additional references to show this step.

On the other hand, in the continuation-in-part application for the Hannon '497 patent, the Patent Examiner rejected all claims as being fully anticipated by the Rudershausen et al. patent.

From a letter dated November 28, 1967, it is clear that Hannon's attorney recognized that Rudershausen had "printed indicia between two layers of polyethylene copolymer."

In the continuation-in-part applications, no effort was made to distinguish the Rudershausen et al. patent. The holdings of the Patent Examiner, obviousness in the case of the '171 process claims and anticipation in the case of the '497 claims, were not contested. Instead, in both applications, affidavits were filed purporting to show that Hannon had conceived and reduced the developments of the '171 and '497 patents to practice prior to the filing date of the Rudershausen et al. patent. On this basis, and pursuant to the provisions of Patent Office Rule 131, the Examiner rescinded the rejections that had been based upon the Rudershausen et al. patent and allowed the applications for the Hannon '171 and '497 patents. Furthermore, from a letter dated June 6, 1968, it would appear that Hannon deliberately delayed the issuance of his process ('171) patent so as to avoid a determination of priority through an interference with Rudershausen et al. Thus, the various actions taken in the Patent Office on behalf of the patentee, Hannon, indicate that the basic inventions of Hannon '171 and '497 were anticipated by the Rudershausen et al. patent, if that patent is available as prior art.

There is a difference in practice between the courts and the Patent Office with respect to antedating an anticipatory reference.

"The burden of proof upon one who seeks to establish a date for his invention prior to that of his application has always been deemed a heavy one. 'Courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as a criminal case, in practice perhaps even more so.' United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263, 264, 25 USPQ 298 (2d Cir. 1935). See also Moline Plow Co. v. Rock Island Plow Co., 212 F. 727, 732 (7th Cir. 1914). . . . Moreover, the acceptance by the Patent Office of Rule 131 affidavits is not binding on a court. When the validity of a patent is challenged, the patentee who asserts a date earlier than his application may not rely on the customary presumption of validity arising from the issuance of a patent, but must produce strong and convincing evidence in support of the date claimed. Sperry Rand Corp. v. Knapp-Monarch Co., 193 F.Supp. 756, 762, 127 USPQ 193 (E.D.Pa.1961), modified on other grounds, 307 F.2d 344, 134 USPQ 433 (3d Cir. 1962). The burden of proof to establish a pre-filing invention date is far more severe in an infringement action than that under Rule 131 in an ex parte proceeding before a Patent Office examiner. Oelbaum v. The Lovable Co., 211 F.Supp. 594, 601, 136 USPQ 58, 63 (S.D.N.Y.1962), aff'd, 323 [322] F.2d 1022, 139 USPQ 60 (2d Cir. 1963), cert. denied, 376 U.S. 937 (1964); see also Messler v. United States Rubber Co., 148 F.2d 734, 65 USPQ 145 (2d Cir. 1945), cert. denied, 326 U.S. 717 [66 S.Ct. 22, 90 L. Ed. 424], 67 USPQ 359 (1946)." Gyromat Corp. v. H. G. Fischer & Co., 167 USPQ 326, 331 (N.D.Ill.1970).

In this case, the plaintiff has not met its heavy burden of proof in its attempt to establish Hannon's conception and reduction to practice prior to the date of reference of the Rudershausen et al. patent. The only corroborating testimony with respect to the existence of the Hanon '171 and '497 identification cards prior to the application date of the Rudershausen et al. patent came from the patentee's attorney, Mr. Fischer. It is apparent that the attorney did not himself know what construction was involved in the cards he saw, but instead, simply accepted the word of the patentee. Reduction to practice may not be based upon the uncorroborated testimony of an inventor. As stated by the court in Tidewater Patent Development Co. v. Gillette Co., 273 F.2d 936 (4th Cir. 1960):

"[W]e must apply the established rule that an inventor's own testimony with respect to his invention and reduction to practice constitutes a selfserving [sic] declaration and cannot be given probative force even if it is uncontradicted and convincing unless it is supported by adequate corroboration." 273 F.2d at 940.

Furthermore, there was no evidence to indicate that any tests were made to bear out the claimed tamper-resistant qualities of these cards, and testing, usually under actual conditions of use, is an essential part of reduction to practice. Cleeton v. Hewlett-Packard Company, 343 F.Supp. 1215, 1219–1221 (D. Md.1972). As expressed in Farrand Optical Co. v. United States, 325 F.2d 328 (2d Cir. 1963):

"What constitutes 'reduction to practice' has been the subject matter of many decisions. 'The general rule is well established that tests under actual working conditions are necessary to establish reduction to practice.' Kruger v. Resnick, 197 F.2d 348, 39 C.C.P.A. Patents, 994, and cases there cited. Gaiser v. Linder, 253 F.2d 433, 436 (C.C.P.A.1958)." 325 F.2d at 331.

Inasmuch as the critical feature of the Hannon card pertains to allegedly improved tamper protection, but there was no evidence of testing nor acceptable corroboration of the inventor's testimony as to how he had made any cards or what they were made of, the plaintiff has failed to establish a reduction to practice prior to the date of application of the Rudershausen et al. patent. Accordingly, the Court is able to conclude that the Hannon '171 and '497 patents were fully anticipated by the Rudershausen et al. patent and hence are invalid under 35 U.S.C. § 102.

But, even if the plaintiff had been successful in antedating this anticipatory reference, the Rudershausen et al. patent serves as both additional and persuasive evidence that the limited change suggested by Hannon '171 and '497 was obvious to those of ordinary skill in the art. As stated in All States Plastic Manufacturing Co. Inc. v. Weckesser Co., Inc., 362 F.Supp. 94 (N.D. Ill.1973):

"Contemporary developments by third parties working in the recognized art of the patent in suit . . . are persuasive evidence that the subject matter of the claims in issue of the patent in suit was obvious within the meaning of 35 U.S.C. § 103."

This statement is based upon Felburn v. The New York Central Railroad Company, 350 F.2d 416 (6th Cir. 1965), cert. denied, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966), where the court, in considering the effect of a publication which did not qualify as prior art under Section 102, held that the publication nevertheless constituted "credible evidence of an independent development" which it regarded as "persuasive that the claimed invention would have been obvious to one of ordinary skill in this

art." 350 F.2d at 425. To this same effect, see Amerline Corp. v. Cosmo Plastics Company, 271 F.Supp. 215, 227 (N. D.Ill.1967), aff'd, 407 F.2d 666 (7th Cir. 1969); Popeil Brothers, Inc. v. Schick Electric, Inc., 356 F.Supp. 240, 251 (N. D.Ill.1972).

## ATTORNEY FEES

■ The general American rule that attorney fees are not recoverable as costs or damages in the absence of an enforceable contract providing therefor applies to patent cases, Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 720–721, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), save for the statutory provision for an award of reasonable attorney fees to the prevailing party in an exceptional case. 35 U.S.C. § 285. Thus, Congress's intent in enacting the statute was not to permit the routine recovery of attorney fees in patent cases, but to permit a court to award fees in an extraordinary case so as to prevent gross injustice. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294 (9th Cir. 1969).

■ Certainly the defendants here will suffer no "gross injustice." This record cannot be read to suggest that the patentee's acts, taken individually or together, were either fraudulent or the product of a calculated recklessness about the truth that would constitute a serious breach of duty to the Patent Office.

"In the usual and ordinary suit for infringement of a patent, instituted in good faith and vigorously prosecuted, the court, in the absence of evidence of bad faith or dilatory, harassing or vexatious tactics on the part of the plaintiff, should not award attorney fees to the prevailing defendant." 8 Deller's Walker on Patents § 760 (2d ed. 1973), citing National Brass Co. v. Michigan Hardware Co., 75 F.Supp. 140 (W.D.Mich. 1948). The first two clauses adequately describe this case, and, since none of the

latter elements have been established, there will be no award under Section 285.

The foregoing memorandum of decision is intended to satisfy the requirements of Rule 52(a) of the Federal Rules of Civil Procedure.